# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 22, 2012 Session

## STATE OF TENNESSEE v. BRANDON ACKERMAN

**Appeal from the Criminal Court for Davidson County**
**No. 2007-B-1632     Monte Watkins, Judge**

---

**No. M2010-01979-CCA-R3-CD - Filed July 13, 2012**

---

A Davidson County Criminal Court jury convicted the defendant, Brandon Ackerman, of four counts of soliciting sexual exploitation of a minor,[1] *see* T.C.A. § 39-13-529(b)(1) (2006); two counts of child abuse, *see id.* § 39-15-401; and one count of rape of a child, *see id.* § 39-13-522, and the trial court imposed a total effective sentence of 27 and one half years' incarceration, 20 years of which was to be served at 100 percent by operation of law, *see id.* § 39-13-523(b). In this appeal, the defendant asserts that the trial court erred by excluding the testimony of his expert witness, by admitting into evidence a video recording of the victim's forensic interview, by permitting three State's witnesses to testify regarding the hearsay statements of the victim, and by denying his motion to suppress his pretrial statements to his ex-wife and to police. Because the trial court erroneously admitted into evidence the video recording of the forensic interview and the victim's hearsay statements to three witnesses and because those errors cannot be classified as harmless, the judgments of the trial court are reversed, and the case is remanded for a new trial.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Reversed and Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and JEFFREY S. BIVINS, JJ., joined.

---

[1]The indictment, the judgment, the written election of offenses prepared by the State, and the minute entry memorializing the jury verdict refer to conviction offenses of "sexual exploitation of a minor," but the language of the indictment tracks that of Code section 39-13-529 and contains a citation to that statute. The offense named in that statute is "soliciting sexual exploitation of a minor." *See* T.C.A. § 39-13-529. The offense of "sexual exploitation of a minor" is codified at section 39-17-1003 and makes it unlawful "to knowingly possess material that includes a minor engaged in . . . [s]exual activity; or . . . [s]imulated sexual activity." T.C.A. § 39-17-1003(a). The mislabeling of the offenses in this case does not create any error in the convictions.

Mark C. Scruggs, Nashville, Tennessee, for the appellant, Brandon Ackerman.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Brian Holmgren and Kristin Menke, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Davidson County grand jury charged the defendant with four counts of soliciting sexual exploitation of a minor, six counts of aggravated sexual battery, three counts of aggravated rape of a child, three counts of rape of a child, and simple possession of marijuana related to the abuse of his daughter, M.A., between January and October 2006.[2]

At trial, M.A. testified that she was born on August 20, 2002, and that the defendant was her father, although she could not identify the defendant at the time of trial because she had not seen him in nearly three years. The victim recalled that she visited the defendant occasionally when she was four years old and that she slept in the bed with the defendant when she spent the night at his residence. She also recalled that the defendant took a bath with her one time. M.A. could not recall playing a "puppy game" with the defendant or telling anyone about playing such a game. M.A. said that she did not know why she no longer visited the defendant and had no independent recollection of having participated in a forensic interview. M.A. testified that she had viewed the video recording of her forensic interview on the eve of trial, but that viewing did not refresh her memory. She said that she made the statements contained in the video and that the statements were "the truth." M.A. testified that she recalled the defendant's touching her "koochie" with "[h]is hands and tongue" because "the video reminded" her. She could not recall having ever seen the defendant's penis. M.A. denied telling a friend of her mother's, Melissa Miller, about the defendant's touching himself, "peeing," or putting his mouth on any part of her body.

During cross-examination, the victim said that she did not remember telling the forensic interviewer that a boy at school had touched her inappropriately. M.A. testified that she watched the video recording with her mother, grandmother, and aunt, and that the three women told her that it was important to repeat what she had said on the video. M.A. reiterated that she had no independent recollection of the defendant's having touched her vagina and that her only recollection came from having reviewed the video recording.

Melissa Miller testified that she lived with the victim and the victim's mother, Amanda Ackerman, for approximately four or five months in 2006 and early 2007 and often

---

[2]In keeping with the policy of this court, we refer to the minor victim by her initials.

cared for the victim during that time. During the first half of October 2006, Ms. Miller cared for the victim while Ms. Ackerman was out of town on business. Ms. Miller testified that during that week, the victim told her that the defendant "licked her koochie" while playing "a puppy dog game."

Ms. Miller said that she waited to tell Ms. Ackerman about the victim's disclosure until she could do so face-to-face, which ended up being more than a week later. Ms. Miller recalled that the victim was present during her conversation with Ms. Ackerman, "[b]ut she wasn't listening." Ms. Ackerman then asked the victim about the abuse, and the victim told Ms. Ackerman "pretty much[] the same thing" she told Ms. Miller. The two women then dropped the victim off with Ms. Ackerman's mother, informed the grandmother "what was going on," and went to confront the defendant at his apartment. Ms. Miller said that the defendant would not make eye contact with Ms. Ackerman during the conversation and that he showed no emotion in response to the allegations. She said the defendant denied the allegations, saying that he only saw or touched the victim when she was naked when he was giving her a bath.

Ms. Miller testified that when they returned to Ms. Ackerman's mother's house, Ms. Ackerman told the victim to tell her grandmother what had happened. The victim did so, and she drew a picture of her and the defendant lying "on a bed playing the puppy dog game."

During cross-examination, Ms. Miller said that Ms. Ackerman never told her that the defendant had a problem wetting the bed or masturbating while asleep. She conceded that approximately one month prior to the victim's disclosure, the defendant told Ms. Ackerman that the victim had made similar accusations against a boy in her class. Ms. Miller said that the victim told her that the puppy dog game involved the defendant chasing the victim and acting like a puppy and conceded that she did not ask the victim whether she was naked or clothed during the game. Ms. Miller acknowledged having had a sexual encounter with the defendant just prior to the victim's disclosure, but she claimed that the encounter was not consensual. Ms. Miller said that she was upset with the defendant following their encounter, but she did not contact the authorities.

Amanda Ackerman testified that she married the defendant in 2001 and that the victim was born on August 20, 2002. The couple divorced in November 2005. Ms. Ackerman insisted that the divorce was amicable, and the couple agreed on a visitation schedule of every other weekend. She said that in the summer of 2006, the victim told her that the defendant "had peed in the bed." She said she asked the defendant about it, and the defendant denied it.

Ms. Ackerman testified that after Ms. Miller told her what the victim had said, she asked the victim about the game, and the victim said that the defendant "had licked her koochie and asked her to lick his, or made her lick his." Ms. Ackerman said that the victim had never mentioned the puppy game before. She did not ask the victim whether she and the defendant were clothed during the game or how many times they had played the game. Ms. Ackerman testified that the victim also told her again that the defendant had peed in the bed and that "he would need to rub and play with his koochie in order to make it pee."

Ms. Ackerman said that when she and Ms. Miller confronted the defendant with the victim's allegations, "[h]e very nonchalantly denied it." She said that the defendant said "at one point . . . that there was maybe a child at her school named Brandon that maybe she was getting him confused with." She said that she was not aware of any sexual liaison between Ms. Miller and the defendant at the time the victim made her disclosure.

Ms. Ackerman testified that she stopped allowing the victim to visit the defendant after the victim made the allegations. At some point, Detective Greg Robinson asked her to participate in a controlled telephone call with the defendant "[t]o see if he was willing to provide any information." An audio recording of that telephone call was played for the jury. During the conversation, Ms. Ackerman repeatedly promised the defendant that he would be permitted to see the victim again and that their lives would return to normal if he admitted that he had abused the victim. The defendant eventually told Ms. Ackerman that the victim had seen him masturbate in the bed and that it was possible that the victim had kissed his crotch over his clothes. The defendant admitted licking the victim "all over her body" during a game where he pretended to be a dog, but he said that they were both fully clothed and that the game was not sexual in nature. He said that he was sorry for having engaged in any activity that made the victim uncomfortable.

During cross-examination, Ms. Ackerman testified that she would not tell a lie even if her refusal to do so meant she would never see her daughter again but admitted that she had lied to the defendant during their recorded telephone conversation. She also admitted that she repeatedly told the defendant that he would not be permitted to see the victim again until he admitted the allegations. She specifically conceded telling him, "We won't ever talk about it again. You can have her for Christmas and we'll pretend this never happened."

Ms. Ackerman conceded that the defendant told her in the summer of 2006 that the victim said that another child in her class had touched her inappropriately. She also admitted that the victim told the forensic interviewer that the same child had touched her inappropriately in the bathroom at school. She said that she made a report to the victim's daycare provider, but there was no student at the daycare by that name. Ms. Ackerman

-4-

acknowledged that the victim also mentioned being touched inappropriately by another little girl, but Ms. Ackerman did not take that disclosure seriously because she "knew that child's parents very well and [she] didn't really believe that that was something that was going on."

Ms. Ackerman admitted that during their marriage, the defendant would sometimes go to bed clothed but wake up unclothed without any explanation.

The victim's maternal grandmother, Pat Johnson, testified that the victim told her that the defendant "pees in the bed" and then "wipes it up" and that "he has to pull on it before he can go." Ms. Johnson told the victim that the defendant "might be sick and we probably need to get help." The victim told her, at Ms. Ackerman's prompting, that she played a "puppy game" with the defendant where they licked each other. Ms. Johnson said that the victim did not act like the puppy game was "anything unusual" and did not appear to be upset at all. The victim drew a picture of the puppy game which was a short stick person and a tall stick person lying "head to foot and foot to head."

Charlsi Legendre, a forensic interviewer with the Williamson County Child Advocacy Center, testified that she conducted a forensic interview of the victim in November 2006. Ms. Legendre said that the victim initially said that someone touched her vagina at school while she was using the restroom. Eventually, the victim disclosed that the defendant had touched her inappropriately. Ms. Legendre, over the defendant's objection and despite not having been qualified as an expert, said that it was her experience as a forensic interviewer that sexual predators often disguise sexual abuse as a game.[3]

A video recording of Ms. Legendre's interview of the victim was played for the jury. During the video, the victim said that the defendant licked her "koochie" and that she licked his "koochie." The victim also told Ms. Legendre that the defendant touched his koochie to make it pee.

Metropolitan Nashville Police Department Detective Gregory Robinson testified that he arranged for Ms. Ackerman to make a "pretextual" telephone call to the defendant that was recorded. Later, he interviewed the defendant in person, and that interview was also audio recorded.

During cross-examination, Detective Robinson said that it was Ms. Ackerman's idea to tell the defendant that he would not be able to see the victim unless he admitted the

---

[3]The rules of evidence limit the admission of opinion testimony by lay witnesses to "to those opinions or inferences which are . . . rationally based on the perception of the witness and . . . helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701.

allegations and that he "thought she did a good job." Detective Robinson admitted that he lied to the defendant during his interview, telling the defendant that the victim would undergo a medical examination and that DNA evidence would tie him to the crimes.

An audio recording of Detective Robinson's interview of the defendant was played for the jury. During that interview, the defendant admitted that he had masturbated in the bed he shared with the victim when he thought that she was asleep. He said that he knew of "three or four" times that the victim saw him masturbating. The defendant said that he had showered with the victim. After the detective told the defendant that the victim would undergo a physical examination and DNA testing, the defendant said that it was "possible" that the victim had kissed his penis when he was getting out of the shower when she "ran up to" him to give him a hug. The defendant also intimated a belief that Ms. Ackerman might "call[] and drop[] the case," but Detective Robinson clarified that the investigation would proceed with or without Ms. Ackerman's participation. The defendant said that it was possible that his tongue had "slipped" into the victim's vagina while the two were playing.

At the conclusion of Detective Robinson's testimony, the State rested. The State dismissed counts 6, 7, 9, 10, 11, 12, and 15, and moved to amend the indictment as to count 13, 14, and 16 "to reflect dates of offenses between January 1, 2006 and October 11, 2006" and to lower the charge of aggravated rape of a child, *see* T.C.A. § 39-13-531, to rape of a child, *see id.* § 39-13-522.

The defendant testified that he married Ms. Ackerman in 2001 and that their marriage was "horrible" and "[a]lmost like a nightmare" because she "was constantly badgering" him. He said that he had struggled with bed wetting, even as an adult, and that Ms. Ackerman made him "feel like less of a man, like . . . a little child that just wet the bed all the time." He said that their divorce was not amicable because her infidelity led to the break-up. The defendant testified that despite his contentious relationship with Ms. Ackerman, visitation with the victim was great until the allegations. He testified that the puppy dog game involved him chasing the victim and licking her like a dog while they were both clothed. The defendant denied having had any sexual feelings toward the victim as they played the game, and he said that he never licked the victim near her vaginal area.

The defendant said that he occasionally awoke naked after having gone to bed clothed and that he had also occasionally awoken to discover that he was masturbating. He explained that the victim's allegation that he had masturbated in front of her likely arose from his masturbating while he was asleep but the victim was awake. He said that he had no personal recollection of the victim's ever having seen him masturbate.

The defendant testified that several months prior to the victim's accusations

against him, his mother made him aware that the victim had reported being sexually abused by someone at her school. He said that he told Ms. Ackerman, and she told him that she had made a report of the alleged abuse. He said that following this report, the victim did not want him to wash her genital area.

The defendant stated that he and Ms. Miller got drunk and had sex in September 2006 and that he "thought it was consensual and apparently she didn't." He said that Ms. Miller told him he would "pay for this."

The defendant acknowledged making admissions to both Ms. Ackerman and Detective Robinson, but he insisted that he made the admissions to Ms. Ackerman because she said he could not see the victim unless he did so and to Detective Robinson because he thought that if he told the detective "what he wanted to hear [he] would be able to go home."

The defendant's mother, Kimma Ackerman, testified that she cared for the victim every weekend while the couple was married and on a fairly regular basis after their divorce. She described Ms. Ackerman as "overbearing" and "very hateful" and the victim's living conditions with her mother as "not very clean." Kimma Ackerman said that sometime in 2006, the victim told her that "a little boy at school had been playing[] and had touched her" vagina. She said that she told Ms. Ackerman about the victim's disclosure.

The defendant's sister, Jessica Ackerman, testified that she lived with the defendant from August 2006 to December 2006 and that she was often present in the residence when the victim was visiting. She said that she had occasion to observe the victim and the defendant together and that she never saw anything inappropriate between the two. Jessica Ackerman said that she had observed what had come to be called the "puppy dog game" and that the game was not sexual in nature.

Based upon this proof, the jury convicted the defendant of soliciting sexual exploitation of a minor in counts 1 through 4, of child abuse as a lesser included offense of rape of a child in counts 13 and 14, and guilty of rape of a child in count 16. The jury acquitted the defendant of aggravated sexual battery in counts 5 and 8. Following a sentencing hearing, the trial court imposed a sentence of 20 years for the conviction of rape of a child, a sentence of 4.5 years for each conviction of soliciting sexual exploitation of a minor, and a sentence of three years for each conviction of child abuse. The trial court ordered the convictions for the same offenses to be served concurrently to each other and consecutively to the sentences for the other convictions, for a total effective sentence of 27.5 years' incarceration.

The defendant filed a timely but unsuccessful motion for new trial followed by

a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by excluding the testimony of his expert witness, by admitting into evidence the video recording of the victim's forensic interview, by admitting into evidence the victim's hearsay statements, and by denying his motion to suppress the statements he made to Ms. Ackerman and Detective Robinson. We consider each claim in turn.

*I. Expert Testimony*

The defendant first asserts that the trial court prevented him from presenting a defense by ruling that he would not be permitted to offer the expert testimony of Doctor Bruce Frumkin, who was prepared to testify about the defendant's susceptibility to suggestion and about the propriety of the interview techniques utilized by Ms. Legendre when interviewing the victim. The State contends that the court did not err by excluding the testimony.

Prior to trial, the defendant filed a motion seeking to compel the State to turn over a copy of the video-recorded forensic interview for use by his expert, Doctor Bruce Frumkin. According to the defendant's motion and a report submitted by Doctor Frumkin, Doctor Frumkin intended to offer testimony regarding the defendant's susceptibility to suggestion during the recorded telephone conversation with Ms. Ackerman and the recorded interview with Detective Robinson as well as testimony regarding the interview techniques employed by Ms. Legendre during her interview of the victim. The State responded that it was under no duty to provide the defendant with a copy of the forensic interview and asked for a pretrial hearing to determine the admissibility of Doctor Frumkin's testimony.

At the September 3, 2008 hearing on the admissibility of his testimony, Doctor Frumkin, a forensic and clinical psychologist, testified that the bulk of his practice was "in the area of forensic psychology or the interaction of psychology and the law" and that 50 percent of the criminal cases on which he worked "have to do with evaluating issues pertaining to confessions." He said that the remaining 50 percent of his forensic criminal work "has to do with evaluating competency to stand trial, insanity, mitigating and aggravating circumstances in death penalty cases, risk assessment, looking at [ma]lingering and deception issues, et cetera."

Doctor Frumkin testified that he had performed "over five hundred evaluations" in cases involving "confession-related issues." Doctor Frumkin described the methodology he used to determine the validity of a confession:

> [W]e know from research that there is a number of different
> characteristics that make an individual more vulnerable to

-8-

influence, in terms of giving statements, either to law enforcement or to others.

Intelligence is a factor, as well as anxiety and memory issues and suggestibility, and other sorts of factors, so it's important to evaluate the entire person psychologically and tie that in with what transpired, in terms of that person's specific situation with law enforcement or with others, as well as sometimes, depending upon the case, look at other factors, such as the types of evidence against that person.

He said that the goal of his testimony was to help the jury "better assess the accuracy of both what the defendant said, and if it's appropriate, perhaps what the alleged child victim has said." He said that he would "in no way . . . offer an opinion . . .[that] someone gave a false or coerced confession; or if you're dealing with an alleged child victim, whether the child is telling the truth or is mistaken or what have you."

With regard to his potential testimony regarding the interview techniques employed during the interview of M.A., Doctor Frumkin said that he had previously conducted evaluations of children in child custody cases and that "a lot of those involved allegations of child sexual abuse." He said that he had "gotten involved in looking at child interviews in the criminal court context." Doctor Frumkin admitted that he had no personal experience related to this subject area but said that he was "familiar with the research." He said that he had given presentations in this area of psychology but "not in the last ten, twelve years." He had never published any article "specifically related" to that area of psychology.

Doctor Frumkin testified that he had reviewed the video recording of the victim's forensic interview in the conference room in the district attorney's office but that "for something like this" he needed to spend more "time looking at the interview, starting and stopping the tape, going backwards on the tape, those sorts of the things that involve a number of hours." Doctor Frumkin said that "it appeared to [him] from the questions that were asked in the interview, that the interviewer's job was to get the child to talk about the abuse that they believed had taken place" rather than simply allowing the victim to tell whether any abuse had occurred. He testified that such questioning can cause the child being interviewed to pick up on the interviewer's belief and report what the interviewer wants to hear rather than what actually occurred. He also said that the interviewer failed to make an assessment of M.A.'s "developmental abilities" prior to the interview. Doctor Frumkin maintained that peer-reviewed research supported his conclusion that the interview in this case was not done properly and that, as a result, the interviewer got "inaccurate data" from M.A.

With regard to his potential testimony about the defendant's susceptibility to suggestion, Doctor Frumkin testified that he performed a "comprehensive clinical interview" of the defendant and administered a test to measure intelligence quotient ("IQ"), a personality inventory test, a personality factor test, and "the Gudjohnsson." Doctor Frumkin said that he also interviewed the defendant's mother and reviewed the audio recordings of the defendant's interview with Detective Robinson and the telephone call between the defendant and Ms. Ackerman.

Doctor Frumkin testified that he wanted to determine the defendant's IQ because "interrogative suggestibility, suggestibility overall, is negatively correlated with intelligence. The less intelligent someone is, the more suggestible they oftentimes are." The defendant's IQ, he said, was average, which meant that he had no concern "that because of his intelligence, he would be more suggestible than the average person." Doctor Frumkin said that the personality tests he performed revealed that the defendant was "shy, socially timid," "self-controlled," "rule conscious," and that the defendant felt "persecuted and unfairly punished." On the Gudjonsson Suggestibility Scales, a test designed to show an individual's susceptibility to interrogative suggestion, the defendant's score placed him in the 97th percentile. Doctor Frumkin explained that such a score might explain why the defendant might have confessed to an offense he did not commit when provided with inaccurate information in the form of leading questions.

During cross-examination, Doctor Frumkin reiterated that he would not offer an opinion on whether the defendant's admissions to Ms. Ackerman and Detective Robinson were false. He said that he would instead provide the jury with psychological information about the defendant that would explain why he was more likely to provide false or inaccurate information in the face of that type of questioning. He said that he had no opinion on the accuracy of the defendant's statement, that he would not testify "in terms of the likelihood he gave a false statement or not," and that his only testimony would be that the defendant possessed psychological traits that made him more vulnerable to suggestion. He characterized his testimony as "additional data that [the jury] should look at [to] make a better determination of how much weight to give to what that person is saying."

At the conclusion of the hearing, the trial court took the motion under advisement and, in a later-filed written order, ruled that Doctor Frumkin would not be permitted to testify about the defendant's susceptibility to suggestion because of "the loose connection between D[octor] Frumkin's knowledge and experience and the facts in this case" and because his testimony would not substantially assist the trier of fact. The court also concluded that Doctor Frumkin's testimony would "lead to confusion and misunderstanding." The court excluded Doctor Frumkin's testimony regarding the interview techniques employed during the forensic interview because Doctor Frumkin's knowledge and

-10-

expertise was "limited" and that a "lack of reliability and supporting academic materials" meant that the doctor's testimony "in these areas has a stronger potential to lead to confusion and distraction than it does to a[i]ding the trier" of fact.

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. *See generally McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997). Rule 702 addresses the need for expert testimony and the qualifications of the expert: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Rule 703 focuses on the reliability of expert opinion testimony. Generally, the admissibility of expert testimony is a matter entrusted to the sound discretion of the trial court, and there can be no reversal on appeal absent clear abuse of that discretion. *See State v. Scott*, 275 S.W.3d 395, 404 (Tenn. 2010); *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Scott*, 275 S.W.3d at 404 (citing *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)).

*A. Defendant's Susceptibility to Suggestion*

As Doctor Frumkin explained at the hearing, the purpose of his testimony would have been to provide the jury with "additional data" with which to assess the weight to be attributed to the defendant's admissions to Ms. Ackerman and Detective Robinson. On this point, Doctor Frumkin intended to testify that, based upon his performance on psychological tests administered by Doctor Frumkin, the defendant was vulnerable to suggestion and that this vulnerability "could help explain why" the defendant gave the admissions to Ms. Ackerman and Detective Robinson. He was quite clear that he would not offer an opinion on the accuracy of the information provided by the defendant during these conversations and, perhaps most importantly, that he would not opine that the defendant would have been more or less likely than any other person to provide inaccurate information under the same circumstances.

Another panel of this court dealt with this same issue in *State v. Ted Ormand Pate*, No. M2009-02321-CCA-R3-CD (Tenn. Crim. App., Nashville, Nov. 22, 2011). In that case, Doctor Frumkin testified that Pate " was more accommodating than ninety-five percent of the population, more submissive than ninety-five percent of the population, and more socially timid than eighty-five percent of the population." *State v. Ted Ormand Pate*, No.

-11-

M2009-02321-CCA-R3-CD, slip op. at 9-10 (Tenn. Crim. App., Nashville, Nov. 22, 2011).[4] In *Ted Ormand Pate*, Pate complained on appeal that the trial court erred by limiting Doctor Frumkin's testimony about the connection between Pate's susceptibility to suggestion and the interrogation techniques employed by a Metro detective and Pate's ex-wife and by prohibiting Doctor Frumkin from offering an opinion on the interview techniques employed during the forensic interview of Pate's victim. This court ruled that the court did not err by limiting Doctor Frumkin's testimony about the connection between Pate's susceptibility to suggestion and the circumstances of Pate's pretrial admissions, concluding that "the jury could connect the expert testimony with the other testimony at trial through simple logic to reach a conclusion about the veracity of" Pate's admissions. The panel held that the trial court did not err by permitting Doctor Frumkin "to testify about [Pate's] particular personality traits and mental conditions that ma[d]e him more susceptible to suggestion than other people" while allowing the jury to determine how to use that testimony. *Ted Ormand Pate*, slip op. at 15.

Although we agree with the panel in *Ted Ormand Pate* that expert testimony about a defendant's susceptibility to suggestion could be admissible, we cannot say that the trial court in this case erred by excluding Doctor Frumkin's testimony. The limitations placed by Doctor Frumkin on his ability to offer expert opinions specific to the defendant's case made his proffered testimony only marginally relevant at best. Moreover, a real possibility existed that Doctor Frumkin's testimony would lead to a confusion of the issues, as evidenced by the fact that the proffer of his testimony took one full day and that, at times, counsel for both parties seemed confused about the purpose of the doctor's testimony. Under these circumstances, we cannot say that the trial court erred by excluding Doctor Frumkin's testimony on grounds that it would not substantially assist the trier of fact.

### B. Propriety of Forensic Interview Techniques

Again, this court dealt with this precise issue in *Ted Ormand Pate*. There, the trial court excluded Doctor Frumkin's testimony regarding the forensic interview techniques, implicitly concluding, as did the trial court in this case, that Doctor Frumkin was not qualified as an expert in this area. Following a review of Doctor Frumkin's testimony, which was substantially the same as that offered in this case, the panel said that the trial court's conclusion was "not illogical." *Id.*, slip op. at 17. That analysis is apt here.

Doctor Frumkin testified that he had previously performed evaluations of children in child custody cases and that he had "gotten involved in looking at child interviews in the criminal court context," but he had not personally conducted any forensic interviews

---

[4]Interestingly, this testimony is very similar to the testimony offered in the defendant's case.

or performed any research into the area of forensic interview techniques. He said that he had given presentations on this type of information in the past, but that he had not done so in more than a decade. During that decade, Doctor Frumkin had primarily focused on his forensic criminal work, which included "evaluating issues pertaining to confessions," and "evaluating competency to stand trial, insanity, mitigating and aggravating circumstances in death penalty cases, risk assessment, looking at [ma]lingering and deception issues, et cetera." Doctor Frumkin also acknowledged that, unlike his work in the area of interrogative suggestibility, he had not published any article "specifically related" to the area of forensic interview techniques. The trial court's conclusion that Doctor Frumkin's expertise in this area was "limited" was essentially a ruling that the doctor was not qualified to offer expert testimony on the propriety of the interview techniques employed by Ms. Legendre, and that conclusion is supported by the record. Consequently, the trial court did not abuse its discretion by excluding Doctor Frumkin's testimony.

## C. Constitutional Right to Present a Defense

The defendant also argues, generally, that the trial court's exclusion of Doctor Frumkin's testimony infringed upon his constitutional right to present a defense.

Although "[p]rinciples of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony" favorable to his cause, *State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000)), that right is not without limits*, see id.* (citing *Chambers*, 410 U.S. at 302). Indeed, the Supreme Court has observed that "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence." *Chambers*, 410 U.S. at 302. "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *Flood*, 219 S.W.3d at 316 (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Holmes v. South Carolina*, 547 U.S. 319 (2006); *Chambers*, 410 U.S. at 302). To determine whether a particular evidentiary ruling has violated a defendant's constitutional right to present a defense, a reviewing court must consider:

> (1) Whether the excluded evidence is critical to the defense;
>
> (2) Whether the evidence bears sufficient indicia of reliability; and
>
> (3) Whether the interest supporting exclusion of the evidence is substantially important.

*Flood*, 219 S.W.3d at 316 (citing *Brown*, 29 S.W.3d at 434-35; *State v. Rice*, 184 S.W.3d 646, 673 (2006); *State v. Rogers*, 188 S.W.3d 593, 614 (Tenn. 2006)).

Utilizing these factors, we cannot say that the exclusion of Doctor Frumkin's testimony on either point rose to the level of a constitutional deprivation. As discussed, Doctor Frumkin's testimony regarding the defendant's susceptibility to suggestion had little probative value and did little in the way of attacking the prosecution's case. Moreover, defense counsel thoroughly cross-examined both Ms. Ackerman and Detective Robinson about the circumstances attendant to the defendant's admissions and Ms. Legendre about the techniques employed during the forensic interview. In addition, the defendant testified that he made the admissions to Ms. Ackerman only because he wanted to see the victim and to Detective Robinson because he believed he would be released if he did so. Furthermore, the record establishes that the jury was able to parse the defendant's admissions as evidenced by its verdicts of not guilty on the four counts of aggravated sexual battery, the charges about which the defendant's admissions appeared the most damning. The defendant is not entitled to relief on this issue.

### D. Access to Video Recording

In a related issue, the defendant contends that Doctor Frumkin's testimony and, by extension, his right to present a defense was hampered by the State's refusal to provide him with a copy of the video recording of the forensic interview of the victim. The State does not assert a valid basis for not providing a copy of the video recording to the defendant and contends only that the defendant has failed to establish that he was prejudiced by the discovery restriction.

This court also dealt with this issue in *Ted Ormand Pate*. There, we held that the trial court did not err by denying Pate's request for a copy of the video recording of the forensic interview because reports of child sexual abuse are confidential and because disclosure of the video was prohibited by Rule 16 of the Rules of Criminal Procedure. *Ted Ormand Pate*, slip op. at 17. Unlike *Ted Ormand Pate*, however, the prosecution in this case used the video recording in its case-in-chief. Tennessee Rule of Criminal Procedure 16(a)(1)(F) provides:

> Documents and Objects. - Upon a defendant's request, the [S]tate shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings, or places, or copies or portions thereof, if the item is within the [S]tate's possession, custody, or control and:

-14-

(i) the item is material to preparing the defense;

(ii) the government intends to use the item in its case-in-chief at trial; or

(iii) the item was obtained from or belongs to the defendant.

Tenn. R. Crim. P. 16(a)(1)(F).

The language of Rule 16(a)(1)(F) is straightforward, and the State's duty is mandatory. Upon request, "the state *shall permit*" inspection and copying. *Id.* (emphasis added). The State had no justifiable reason for refusing to provide the defendant a copy of the video recording in this case. That being said, we agree with the State that the error was harmless. *See* Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). Although the State refused to provide the defendant with a copy of the recording, it did permit defense counsel and Doctor Frumkin to view the recording at any time at the district attorney's office. Accordingly, we cannot say, based upon this record, that the failure to provide the defendant with a copy of the video recording more probably than not affected the outcome of the trial.

## II. Video Recording of Forensic Interview

The defendant next contends that the trial court erred by admitting the video recording of the forensic interview of the victim as substantive evidence pursuant to Tennessee Rule of Evidence 803(26), claiming that Tennessee Rule of Evidence 803(26) is unconstitutional and that, even if the rule is constitutional, the video does not satisfy the requirements for admission. The State asserts that the rule is not unconstitutional and that the trial court did not err by admitting the video pursuant to the rule.

Following the defendant's 2007 indictment, it was the position of the State during myriad pretrial hearings on a variety of subjects that the video recording of the victim's forensic interview at the Williamson County Child Advocacy Center was inadmissible hearsay. Indeed, the inadmissible nature of the video was often cited by the prosecutor as part of the State's justification for refusing to provide the defendant with a copy of the video recording of the interview. Then, in 2009, our supreme court adopted an amendment to the rules of evidence creating a new hearsay exception at Rule 803(26). That Rule provides:

The following are not excluded by the hearsay rule:

. . . .

A statement otherwise admissible under Rule 613(b) if all of the following conditions are satisfied:

(A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.

(B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.

(C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Tenn. R. Evid. 803(26). On September 18, 2009, the State filed notice of its intent to offer the video-recorded forensic interview as substantive evidence of the defendant's guilt during its case-in-chief and asking for a pretrial hearing on the issue.[5] The State claimed that the victim no longer had any memory of the offenses and that the State anticipated that the victim would testify inconsistently with the disclosures made during the interview. Additionally, the State contended that admission of the video would not violate the defendant's constitutional right to confront the witnesses against him because the video did not qualify as testimonial under the "primary purpose" test promulgated in *Crawford v. Washington*, 541 U.S. 36 (2004), and because the victim would testify at trial and be subject to cross-examination.

During the pretrial hearing on the matter, neither party proffered any evidence. The trial court took the motion under advisement. In its written order, the trial court concluded that the video recording was made under circumstances indicating trustworthiness and that use of the video would not violate the defendant's confrontation right because the victim would be present for cross-examination. The trial court ruled that "should the child

---

[5]We note that it would be impossible for a trial court to determine admissibility under this rule prior to trial because Rule 613 requires that the witness testify inconsistently *at trial*. Until a witness has offered testimony at trial, the court could not intelligently make a ruling on whether the trial testimony was inconsistent with the prior statement.

witness give testimony which is inconsistent with her previous statements, the forensic tape may be admissible under Tennessee Rules of Evidence 803(26) as applicable under Tennessee Rules of Evidence 613(b)."

### A. Admission of the Video Recording via Rule 803(26)

Because M.A.'s testimony is crucial to a review of this issue and the next, we repeat the relevant portions in some detail:

> Q:      Do you remember talking to . . . Melissa Miller about any things that happened over at your dad's house?
>
> A:      No.
>
>         . . . .
>
> Q:      Do you remember anything called the puppy game?
>
> A:      No.
>
>         . . . .
>
> Q:      Do you remember ever talking to anybody about a puppy game that happened at your dad's house?
>
> A:      No.
>
>         . . . .
>
> Q:      [M.A.], before you came to Court today, did you watch a movie that you were in?
>
> A:      Yes.
>
> Q:      Do you remember anything about how that movie was made?  Did you know that a movie was being made when it happened?
>
> A:      No.
>
> Q:      Who is in that movie that you watched?
>
> A:      Me.
>
> Q:      Anyone else?
>
> A:      Charlsi.
>
>         . . . .
>
> Q:      Did you recognize you in that video?
>
> A:      Yes.
>
> Q:      When was the last time that you watched that video, [M.A.]?
>
> A:      Yesterday night.
>
>         . . . .
>
> Q:      Did watching that movie help you to remember any of the things that you said to Charlsi in that movie?

-17-

A: No.

  . . . .

Q: Do you know whether or not you told the truth or not in that video?

A: I told the truth.

Q: Do you remember anything about the things that you told Charlsi that you saw on that video?

A: No.

Q: Did you talk to Charlsi about a puppy licking game?

A: Yes. But I don't remember doing it.

Q: Okay. But you remember seeing that and talking about that on the video?

A: Yes.

Q: Did you talk about the kinds of things that happened in the puppy licking game?

A: No.

  . . . .

Q: Okay. Do you remember telling Charlsi anything about different kinds of touching that happened between you and your dad?

A: No.

Q: When you watched that videotape, did you tell Charlsi about certain kinds of touching that took place?

A: I don't remember.

Q: You don't remember telling Charlsi, or you don't remember those things happening, [M.A.]?

A: I don't remember telling Charlsi or doing it.

  . . . .

Q: Do you remember telling Charlsi that somebody touched you on either [the bottom or vagina]?

A: No.

Q: Do your remember your dad ever touching you on any parts of your body?

A: Yes.

Q: Where do you remember your dad touching you on your body?

A: My koochie.

Q: What did he touch you with?

A: His hands and tongue.

Q: Do you remember that happening?

A: No.

Q: Why do you say that he did that?

A: Because the video reminded me.

Q: Okay. So, you saw that you said those kinds of things on the video that you watched last night?

. . . .

Q: Okay. Do you remember talking to Charlsi on that video about seeing your dad touch himself in different ways?

A: No.

Q: Okay. . . . Did you ever talk to Charlsi about your dad peeing?

A: I don't remember.

Q: Did you ever talk to your mom about your dad peeing?

A: No.

Q: What about Melissa, did you ever talk to her about peeing?

A: No.

Q: Did you ever talk to Melissa about your dad putting his mouth on any parts of your body?

A: No.

Q: Did you ever talk to your mom about your dad putting his mouth on any parts of your body?

A: I don't remember.

Q: Did you ever talk to your mom about putting your mouth on any parts of your dad's body?

A: I don't remember.

Q: What about your dad's tongue? Did you ever talk to Charlsi about your dad's tongue touching you on any parts of your body?

A: I can't remember.

Q: Do you remember ever talking to your mom about your dad's tongue touching you on any parts of your body:

A: I don't remember.

. . . .

Q: Do you remember using the words yucky water when you talked to Charlsi?

A: I don't remember.

. . . .

Q: Do you remember telling Charlsi that your dad would touch, or lick, a part of your body with his mouth?

-19-

A: I don't remember.

. . . .

Q: Do you remember talking to your grandmother about peeing in bed, at all?

A: No.

Q: What about playing a puppy game?

A: No.

During Ms. Legendre's direct examination, she testified that she interviewed the victim on November 7, 2006, and that the interview was video recorded. The trial court then permitted the State to play the video-recording of the victim's interview in its entirety.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." *Id*. 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of inadmissibility of hearsay. Because "[n]o factual issue attends" the trial court's determination whether a statement is hearsay, "it necessarily is a question of law." *State v. Gilley*, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008) (citing *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)). Although the application of the various exceptions to the hearsay rule "may initially depend upon factual determinations" to which a reviewing court must defer, the trial court "has no discretion to exclude hearsay exception evidence that is otherwise admissible under the rules of evidence." *Id.* at 760-61. Thus, the appropriate standard of review to be applied to the trial court's decision admitting or excluding hearsay evidence is de novo.[6] *Id.*

To be admissible as substantive evidence via Rule 803(26), a statement must first be admissible as a prior inconsistent statement via Rule 613(b). That rule provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Tenn. R. Evid. 613(b). Thus, when a witness testifies in a manner that is inconsistent with a previous statement, the witness's testimony may be impeached with the prior inconsistent statement. Tenn. R. Evid. 613(b). Extrinsic evidence of the prior

---

[6]This is much the same standard applied to the review of a trial court's decision on a motion to suppress. In those cases, the factual determinations of the trial court are conclusive unless the evidence preponderates against them while the application of the law to those factual findings is reviewed de novo. *See Odom*, 928 S.W.2d at 23.

inconsistent statement is inadmissible, however, unless the witness denies making the statement or equivocates about making it. *State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998). "Extrinsic evidence of a prior inconsistent statement remains inadmissible when a witness unequivocally admits to having made the prior statement." *Id.* Extrinsic evidence of a prior inconsistent statement is also admissible when a witnesses testifies inconsistently at trial and then testifies that he or she does not recall making the prior inconsistent statement. *Id.* (*State v. Kendricks*, 947 S.W.2d 875, 881 (Tenn. Crim. App. 1996)). Nothing in this rule permits the admission of a witness's prior statement in its entirety.

Although M.A. said that she could not recall the interview with Ms. Legendre or any of the statements she made during the interview, she did not testify inconsistently with any of the statements she made during that interview. M.A. testified on direct that the defendant had touched her vagina with his tongue and with his hands and that the two had bathed together on at least one occasion. Both of these statements are consistent with M.A.'s statements to Ms. Legendre. M.A. essentially had no memory of any abuse at the hands of the defendant. M.A.'s lack of memory, however, does not qualify as an inconsistency. As indicated, if a witness testifies inconsistently with a prior statement and then evinces a lack of memory about the prior statement, then the prior statement is admissible via Rule 613. That is not what happened in this case. M.A. did not testify inconsistently with the statements she made in the forensic interview but instead stated that she had no memory. Moreover, M.A. acknowledged that the she made the statements contained in the video and that the statements were "the truth." Because M.A. unequivocally admitted making the statements in the video recording and did not testify inconsistently with the statements she made in the interview, extrinsic proof of those statements was not admissible under the terms of Rule 613(b). *See Martin*, 964 S.W.2d at 567. Because the video did not qualify for admission via Rule 613(b), it was not admissible as substantive evidence via Rule 803(26).

Moreover, even assuming for the sake of argument that the victim's lack of memory established an inconsistency sufficient to satisfy the requirements of Rule 613, the entire video would not have been admissible. If the victim's lack of memory was sufficient to establish inconsistency, then only those portions of the video directly related to a claimed lack of memory would have been admissible. *See State v. Charles Jackson and Willis Holloway*, No. W2010-01133-CCA-R3-CD, slip op. at 13 (Tenn. Crim. App., Jackson, Feb. 17, 2012).

## B. Other Avenues of Admission

The video recording would not qualify for admission as a past recollection recorded under Rule 803(5), which provides that a "memorandum or record" is not excluded by the hearsay rule when it concerns

a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

Tenn. R. Evid. 803(5). Here, the record establishes that the video recording was not made by the victim, and no proof satisfied the adoption requirement of 803(5).

Because the video recording is hearsay and does not satisfy the requirements for admission as a prior inconsistent statement via Rule 803(26) or as a past recollection recorded via Rule 803(5), it should not have been admitted. Moreover, given the limited nature of the proof against the defendant, we cannot say that the error was harmless. The defendant made limited admissions to both Ms. Ackerman and Detective Robinson, but the video recording of the victim's claims of abuse was the primary substantive evidence offered by the State to corroborate those admissions. Although Ms. Miller, Ms. Johnson, and Ms. Ackerman all testified that the victim told them that the defendant had licked her vagina and masturbated in the bed, the State retreated from its initial position that their testimony was substantive evidence. Additionally, the State relied heavily on the contents of the video during its closing argument to the jury, making repeated references to the victim's actions as well as her disclosures. At one point, the prosecutor implored the jury to "watch that video" and observe the victim's actions during the video "as a mechanism for coping with having to talk about" the abuse she had suffered and to infer from the language and actions she used during the interview that "[s]he's not manufacturing." On another occasion, the prosecutor asked the jury to watch the video because "the truthfulness of that disclosure should leave no doubt in your mind, let alone any reasonable doubt that this truly happened." On a third occasion, the prosecutor remarked that "ninety-five percent of what [M.A.] said in that forensic interview is accurate and corroborated by everybody else." Under these circumstances, the erroneous admission of the video recording of the forensic interview entitles the defendant to a new trial.

*C. Defendant's Confrontation Right*

The defendant also contends that the admission of the video recording violated his constitutional right to confront the witnesses against him. The State asserts that because the victim was present at trial, there was no confrontation violation.

The Sixth Amendment to the federal constitution and article I, section 9 of the

Tennessee Constitution afford the criminal accused the right to confront the witnesses against him. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Although the provisions are not coterminous, our supreme court "'has largely adopted the standards used by the United States Supreme Court . . . in determining whether the Tennessee constitutional right has been violated.'" *State v. Parker*, 350 S.W.3d 883, 897-98 (Tenn. 2011) (quoting *State v. Maclin*, 183 S.W.3d 335, 343 (Tenn. 2006)); *see also State v. Lewis*, 235 S.W.3d 136, 144 (Tenn. 2007).

In *Crawford v.Washington*, 541 U.S. 36 (2004), the United States Supreme Court departed from decades' long precedent and held for the first time that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 68. "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." *Id.* In *Crawford*, the Court laid the groundwork for what came to be known as "the primary purpose" test for distinguishing testimonial statements from non-testimonial statements. The Court refined the test in later opinions:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington*, 547 U.S. 813, 822 (2006). The Court noted that objective evaluation of "the circumstances in which the encounter occurs and the statements and actions of the parties" is necessary to determine whether a statement is testimonial or non-testimonial. *Michigan v. Bryant*, 131 S. Ct. 1143, 1156 (2011).

Here, the parties agree that the forensic interview qualifies as testimonial, framing the question as whether its admission satisfied the requirements for admission under *Crawford*. In our view, *Crawford* has no application in this case because the declarant, M.A., was present, testified at trial, and was subject to cross-examination. *Crawford* and its progeny are limited to those situations when the State offers into a evidence the out-of-court statement of a non-testifying declarant. *See Crawford*, 541 U.S. at 59 ("Testimonial statements of *witnesses absent from trial* have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."

(emphasis added)).

Our opinion is unchanged by the victim's nearly complete lack of memory. Although a witness' lack of memory may render her "unavailable" for purposes of our rules of evidence, *see* Tenn. R. Evid. 804 ("'Unavailability of a witness includes situations in which the declarant . . . [d]emonstrates a lack of memory of the subject matter of the declarant's statement[.]"), a lack of memory does not render a witness unavailable for purposes of the confrontation clause, *see United States v. Owens*, 484 U.S. 554, 559 (U.S. 1988).[7] In *Owens*, the Supreme Court reiterated its earlier holding that

> "[t]he Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony."

*Owens*, 484 U.S. at 558 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 21-22 (1985)). The Court acknowledged that "[t]he weapons available to impugn the witness' statement when memory loss is asserted will of course not always achieve success" and noted that "successful cross-examination is not the constitutional guarantee," concluding that "when a hearsay declarant is present at trial and subject to unrestricted cross-examination. . . . the traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness' demeanor satisfy the constitutional requirements." *Owens*, 484 U.S. at 560. Here, as in *Owens*, the victim was present at trial and subject to extensive cross-examination; nothing more was constitutionally required.

The defendant urges us to adopt a different holding based upon the "face-to-face" provision of our state constitution. As we have indicated, however, our own supreme court, while noting the difference in the wording of the provisions, has affirmatively adopted the analytical framework promulgated by the United States Supreme Court for federal constitutional questions and applied it to challenges under our state constitution. *See Parker*, 350 S.W.3d at 898; *State v. Franklin*, 308 S.W.3d 799, 812-22 (Tenn. 2010); *State v.*

---

[7]The Court addressed the "semantic inconsistency" between being deemed available for cross-examination for purposes of the confrontation clause but unavailable for purposes of the Federal Rules of Evidence and concluded that "[q]uite obviously, the two characterizations are made for two entirely different purposes and there is no requirement or expectation that they should coincide." *Id.* at 563-64.

*Cannon*, 254 S.W.3d 287, 302-05 (Tenn. 2008); *Lewis*, 235 S.W.3d at 143-47. As such, we decline the defendant's invitation.

### D. Constitutionality of Rule 803(26)

Finally, the defendant contends that Rule 803(26) is unconstitutional. The courts of this state must uphold the constitutionality of statutes where possible, *see Dykes v. Hamilton County*, 191 S.W.2d 155, 159 (Tenn. 1945); *State v. Joyner*, 759 S.W.2d 422, 425 (Tenn. Crim. App. 1987), always beginning review of the constitutionality of a statute "with the presumption that an act of the General Assembly is constitutional," *Gallaher v. Elam*, 104 S.W.3d 455, 459 (Tenn. 2003) (citing *State v. Robinson*, 29 S.W.3d 476, 479-80 (Tenn. 2000); *Riggs v. Burson*, 941 S.W.2d 44, 51 (Tenn. 1997)). Moreover, a reviewing court must "'indulge every presumption and resolve every doubt in favor of the statute's constitutionality.'" *Id.* (quoting *State v. Taylor*, 70 S.W.3d 717, 721 (Tenn. 2002)). The principle most important to our resolution of this case, however, is that "'courts do not decide constitutional questions unless resolution is absolutely necessary to determining the issues in the case and adjudicating the rights of the parties.'" *Waters v. Farr*, 291 S.W.3d 873, 882 (Tenn. 2009) (quoting *Taylor*, 70 S.W.3d at 720 (citing *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995)).

Because we have concluded that the video recording did not satisfy the requirements for admission via Rule 803(26), we need not and may not pass on the constitutionality of the provision. *See Pennell v. San Jose*, 485 U.S. 1, 10 (1988) (quoting *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 294-95 (1981)).

### III. Victim's Statements to Ms. Ackerman, Ms. Miller, and Ms. Johnson

### A. Admission Under the Rules of Evidence

The defendant also complains that the trial court should not have admitted into evidence the statements that the victim made to Ms. Ackerman, Ms. Miller, and Ms. Johnson because those statements were inadmissible hearsay. The State contends that the trial court did not err by admitting the statements because they "were not 'testimonial'" and "were properly admissible as prior inconsistent statements."

Again, we review the trial court's decision to admit hearsay evidence under a de novo standard of review.

The trial court permitted Ms. Miller to testify that the victim "told [her] about a puppy dog game that [the victim and the defendant] played" during which the defendant

-25-

"would crawl on his hands and knees and attempt to lick her all over and then he licked her koochie" and that the victim told her that the game occurred before her fourth birthday. The court also permitted Ms. Miller to testify that she overheard the victim describe to Ms. Ackerman "daddy licking her koochie." In addition, Ms. Miller testified that the victim drew a picture of her and the defendant playing the "puppy game" in the bed.

The trial court permitted Ms. Ackerman to testify that after Ms. Miller relayed to her the victim's statements about the "puppy game," she asked the victim about the game, and the victim said that the defendant "had licked her koochie and asked her to lick his, or made her lick his." The court also allowed her to testify that the victim told her that the defendant peed in the bed and that "he would need to rub and play with his koochie in order to make it pee."

The trial court allowed Ms. Johnson to testify that the victim told her that the defendant "pees in the bed" and then "wipes it up" and that "he has to pull on it before he can go." She also testified that the victim told her, at Ms. Ackerman's prompting, that she played a "puppy game" with the defendant during which they licked each other and that the defendant had licked her vagina during the game.

The prosecutor argued that the victim's statements to the three women were admissible as substantive evidence via Rule 803(26) because the statements "all relate to prior disclosures of abuse which are clearly inconsistent with the witness's testimony here today. And because they're non-testimonial our po[si]tion is they're admissible and substantive proof with respect to the nature of these allegations." The State also argued that the statements were admissible because they were "corroborative of the defendant's confessions" and because "[t]hey place in context the defendant's confessions, and are at the genesis of how this case originated." The trial court overruled the defendant's objection without comment.

Initially, the State did not offer a single valid reason at trial for admitting the victim's statements to the three women. That the statements corroborated the defendant's admissions or that they formed the basis of the criminal complaint has absolutely no bearing on their admissibility. Moreover, the victim's statements to the three women were not admissible via Rule 803(26) because they were not "audio or video recorded" or "given under oath" and the trial court did not conduct a hearing out of the presence of the jury to determine whether the statements were "made under circumstances indicating trustworthiness." Tenn. R. Evid. 803(26)(B),(C). During the defendant's argument on his unsuccessful motion for judgment of acquittal, he again objected to the use of the victim's statements to Ms. Miller, Ms. Ackerman, and Ms. Johnson as substantive evidence. At that point, the prosecutor conceded that the statements were not admissible as substantive

evidence but admitted that he did not know how to "work with that hybrid." The trial court then agreed that the victim's statements to the three women were "not substantive evidence" but did not provide a limiting instruction to the jury.

On appeal, the State argues that the statements were admissible as prior inconsistent statements under Rule 613. That rule permits admission of extrinsic proof of a witness' prior inconsistent statement to be admitted *to impeach the witness* when the witness testifies inconsistently at trial and then either denies making the prior statement or equivocates about having made it.

During her testimony, the victim denied or equivocated about telling the women about the "puppy game" or that the defendant had put his mouth on any part of her body. Because the victim testified on direct examination that the defendant had touched her "koochie" with his tongue, her revelation to the three women that the defendant had licked her vagina did not qualify as a prior inconsistent statement under Rule 613. That the victim did not recall making the revelations to the women does not render the statements admissible given the victim's admission. Her revelation that the defendant "peed" in the bed after manipulating his "koochie," however, did qualify for admission pursuant to Rule 613 to impeach the victim's testimony because she denied or equivocated about making such a statement to Ms. Ackerman, Ms. Miller, or Ms. Johnson. Because the trial court initially overruled the defendant's objection without comment, however, we must presume that the court was convinced by the State's erroneous argument and admitted all of the statements *as substantive evidence*. The trial court did not instruct the jury that the statements were to be used for impeachment purposes only.

To compound this initial error, the trial court did not limit the jury's use of the statements even after it determined that the statements were not admissible as substantive evidence. *See State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000) ("Upon timely objection, the trial court should exclude a prior inconsistent statement when offered as substantive evidence of guilt or innocence, and upon request, the court should instruct the jury that the prior statement may only be considered as reflecting upon the credibility of the witness."). Moreover, even after the State conceded that the statements were not admissible as substantive evidence, the State utilized the statements as such during closing argument. Under these circumstances, we conclude that the jury considered the statements as substantive proof of the defendant's guilt. Given the relative weakness of the State's case and the erroneous admission of the video recorded forensic interview, we cannot say that this error was harmless. As a result, the defendant is entitled to a new trial.

-27-

## B.  Confrontation Clause

The defendant also contends that the admission of this testimony violated his confrontation rights.  Because the victim was present at trial and subject to cross-examination and because the statements do not qualify as testimonial under the primary purpose test, the admission of the statements did not rise to the level of a constitutional deprivation.

## IV.  Motion to Suppress

Finally, the defendant contends, on constitutional grounds, that the trial court erred by denying his motion to suppress the statements that he made to Ms. Ackerman during the recorded telephone call and to Detective Robinson during his pretrial interview.  He claims that Ms. Ackerman became a state actor when she agreed to Detective Robinson's request that she make the "pretextual" telephone call to the defendant and that her conduct during that conversation overbore his will to resist implicating himself in the offenses.  He contends that Detective Robinson overbore his will during questioning by minimalizing the seriousness of the offenses, lying about the proof available to the State, and suggesting that the case would end if the defendant admitted the allegations.  The State asserts that because Ms. Ackerman was not a state actor, the defendant has no valid constitutional claim with regard to her conduct.  The State contends that Detective Robinson's conduct did not render the defendant's statement involuntary.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them.  *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996).  Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them.  *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d).  The application of the law to the facts, however, is reviewed de novo on appeal.  *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).  We review the issue in the present appeal with these standards in mind.

The Fifth Amendment to the United States Constitution provides that "no person . . .shall be compelled in any criminal case to be a witness against himself."  U. S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding "the Fifth Amendment's exception from compulsory self-incrimination" applicable to the states through the Fourteenth Amendment).  This means that, to pass federal constitutional muster and be admissible at trial, a confession must be free and voluntary and not "'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, . . . nor by the exertion of any improper influence'" or police overreaching.  *Bram v. United States*, 168 U.S. 532,

542-43 (1897) (citation omitted). The rule is equally applicable to confessions given during custodial interrogations following appropriate provision of *Miranda* warnings, *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980), and those provided before the defendant has been placed in custody, *see Arizona v. Fulminante*, 499 U.S. 279, 286-88 (1991). To determine voluntariness, the reviewing court must examine the totality of the circumstances surrounding the confession to determine "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined -- a question to be answered with complete disregard of whether or not [the defendant] in fact spoke the truth." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961).

Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citing *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)); *see also State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005). "The critical question is 'whether the behavior of the state's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.'" *Smith*, 933 S.W.2d at 455-56 (quoting *Kelly*, 603 S.W.2d at 728 (internal citation and quotation marks omitted)).[8]

*A. Statements to Ms. Ackerman*

The defendant contends that Ms. Ackerman became a state actor when she agreed to participate in the "controlled telephone call" at the urging of Detective Robinson. He argues that her conduct during that call amounted to an interrogation and that her threats to withhold the victim from the defendant and inducements to "go back to the way things were" overbore his will to resist. The State contends that, utilizing the "legitimate independent motivation" test created by our supreme court in *State v. Burroughs*, 926 S.W.2d 243, 246 (Tenn. 1996), Ms. Ackerman does not qualify as an agent of the state.

In *Burroughs*, our supreme adopted what it termed the "legitimate independent motivation" test for determining when a private citizen becomes a state actor for purposes of the Fourth Amendment. The court observed that "a search by a private individual may transgress the protections of the Fourth and Fourteenth Amendments when an individual acts as an agent or instrument of the state," *see State v. Burroughs*, 926 S.W.2d 243, 245 (Tenn.

---

[8]This test is exactly the same as that promulgated in *Rogers v. Richmond*, 365 U.S. 534, 544 (1961); so it is not clear how this test effectuates the stated goal of providing more protection via the state constitution to the criminally accused.

1996), and promulgated two factors to be considered in determining whether a private citizen had become a government agent: "'(1) the government's knowledge and acquiescence, and (2) the intent of the party performing the search.'" *Id.* at 246 (quoting *United States v. Walther*, 652 F.2d 788, 792 (9th Cir. 1981)). We can find no case in this state applying the "legitimate independent motivation" test, or as it is sometimes called, the "agent or instrument" test, in the context of a Fifth Amendment voluntariness challenge. Accordingly, we must first determine whether the test is applicable to the challenge in this case.

This court considered the admissibility of a similar "controlled telephone call" in *Ted Ormand Pate* and concluded, citing *State v. Robert Bacon*, No. 03C01-9608-CR-00308 (Tenn. Crim. App., Knoxville, Jan. 8, 1998), that Pate was not entitled to relief because he had "voluntarily offer[ed] information to a confidant." *Ted Ormand Pate*, slip op. at 12. In *Robert Bacon*, this court relied on the holding of *Clariday v. State*, 552 S.W.2d 759, 769 (Tenn. Crim. App. 1976). There, considering the admissibility of an audio-recorded telephone call between Clariday and an individual from whom he was accused of taking an illegal bribe, this court, citing *Hoffa v. United States*, 385 U.S. 293, 304 (1966), concluded that there was no Fifth Amendment violation because the statements were voluntary, Clariday had not been subjected to interrogation, and there was no governmental intrusion. *See Clariday v. State*, 552 S.W.2d 759, 769 (Tenn. Crim. App. 1976). Both *Robert Bacon* and *Clariday* include citation to the Supreme Court's proclamation that "[n]either this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Hoffa*, 385 U.S. at 302. The Court made this observation when addressing Hoffa's Fourth Amendment challenge to the informant's testimony, and although other cases have applied this rationale to Fifth Amendment claims, *see, e.g.*, *Robert Bacon*, slip op. at 25; *Ted Ormand Pate*, slip op. at 12, it is clear that that particular statement was limited to Hoffa's challenge under the Fourth Amendment. In addition, the facts in *Clariday* contained a distinctive component. In *Clariday*, the recorded telephone call had been placed by Clariday to the government informant rather than by the government informant to Clariday at the government's behest, as was the case here. Thus, *Clariday* is distinguishable from this case, and reliance on it would not be apt.

In *Hoffa*, the Supreme Court, in determining whether admission of the testimony of a government informant about private conversations between Hoffa and his confidants violated Hoffa's constitutional rights, held that there could be no Fifth Amendment violation in the absence of "some kind of compulsion." *Hoffa v. United States*, 385 U.S. 293, 304 (1966). Without addressing whether the informant was an agent of the government, the Court held that because the conversations Hoffa had with and in the presence of the informant were "wholly voluntary . . . . no right protected by the Fifth Amendment privilege against compulsory self-incrimination was violated." *Id.* In *Procunier*

*v. Atchley*, again without determining whether the informant was a state actor, the Court, utilizing the standard voluntariness test, determined that there was no Fifth Amendment violation in the recording of a conversation between Atchley and an insurance agent who was acting as an informant because Atchley failed to "show either actual coercion or a potentially coercive setting." *Procunier v. Atchley*, 400 U.S. 446, 454 (1971).

The Court then went back to its position in *Hoffa* in *United States v. Henry*, 447 U.S. 264 (1980), stating that "the Fifth Amendment has been held not to be implicated by the use of undercover Government agents before charges are filed because of the absence of the potential for compulsion." *United States v. Henry*, 447 U.S. 264, 272 (1980). Later, in *Illinois v. Perkins*, 496 U.S. 292 (1990), the Court again relied on the principle that use of an undercover agent did not violate the Fifth Amendment, stating, "Where the suspect does not know that he is speaking to a government agent there is no reason to assume the possibility that the suspect might feel coerced." *Illinois v. Perkins*, 496 U.S. 292, 299 (1990).

The unifying theme of the cases is the focus on the presence or absence of compulsion. Because, in those cases, the defendants had assumed the risk of placing their trust in a person they believed to be a confidant, they were unable to show that they had been coerced into incriminating themselves. In each case, the Court did not address the issue of whether the informer was a state actor because, utilizing the standard test for voluntariness, no coercion was shown. In this case, however, the record establishes that Ms. Ackerman utilized threats, inducements, and psychological coercion during the controlled telephone call.

During the call, Ms. Ackerman prefaced the entire conversation by telling the defendant that "Christmas [wa]s coming up" and that he would not be permitted to see the victim unless he admitted the allegations against him and apologized. Ms. Ackerman repeatedly promised the defendant leniency, telling him that if he gave a satisfactory confession, she would "let this go," that they "won't ever talk about this again and . . . go back to the way things were," that she would "let this all be bygones" if he "c[a]me clean," and that he could "have [the victim] for Christmas[] and . . . pretend this never happened." When the defendant steadfastly denied the allegations, Ms. Ackerman told him that he would never be permitted to see the victim again unless he confessed. She encouraged him to admit the allegations so the victim "can have her daddy back." In the face of the defendant's repeated denials, Ms. Ackerman told the defendant he was "going to blow [his] second chance" and that he should "convince [her he was] telling the truth." When he maintained that he did not lick the victim's vagina, Ms. Ackerman accused him of "calling [the victim] a liar." In response to the defendant's statement that he did "not know what to say," Ms. Ackerman demanded, "[S]ay you will never ever lick her again and that you will not be doing things in front of her that you should not be doing . . . . Just tell me that you're not going to

do these things anymore then I will consider, you know, reinstating your visitation." At various points during the conversation, the defendant begged to be allowed to see the victim, telling Ms. Ackerman that he would "do anything" to have his visitation reinstated. The defendant eventually admitted that the victim had seen him masturbate, that he had "licked all over" her body during the "puppy game," and that the victim "may have" kissed his crotch area over his clothes while hugging him. He steadfastly denied licking the victim's vagina or forcing her to lick or kiss his penis.

Ms. Ackerman's repeated threats relative to the defendant's visitation with the victim and her inducements that his confession would result in going "back to the way things were" preponderate against any finding that the defendant's will to resist was not overborne. In consequence, we must determine whether Ms. Ackerman qualifies as a state actor. If she did not make the call as an agent of the state, then her actions, no matter how offensive or outrageous, would not require suppression of the defendant's statements. *Colorado v. Connelly*, 479 U.S. 157, 166 (1986) ("The most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause."). Indeed, as the Supreme Court observed, "The sole concern of the Fifth Amendment . . . is governmental coercion." *Id.* at 170.[9]

The trial court concluded that Ms. Ackerman was not a state actor because as "the mother of the alleged victim" she had "independent motivations for her call to the defendant and her denial of contact between the defendant and the alleged victim." Although the court couched its ruling in terms of the "independent motivations" of Ms. Ackerman, it did not analyze her conduct under the two-pronged test of *Burroughs*.

As indicated, the State suggests the use of the "legitimate independent motivation" test for discerning whether Ms. Ackerman was a state actor. Although this test was originally developed for determining the admissibility of evidence following a Fourth Amendment violation by a citizen, we believe it is apt for determining whether there has been a Fifth Amendment violation. Other courts have used the test, sometimes termed the "instrument or agent" test, for determining whether a Fifth Amendment violation had occurred. *United States v. Day*, 591 F.3d 679, 683 (4th Cir. 2010) ("[R]egardless of whether the Fourth or Fifth Amendment is at issue, we apply the same test to determine whether a private individual acted as a Government agent."); *see also United States v. Sanchez*, 614 F.3d 876, 886 (8th Cir. 2010) (questioning by the defendant's mother, who accompanied him to interrogation, resulted in his confession); *United States v. Erving L.*, 147 F.3d 1240, 1251 (10th Cir. 1998) (defendant's mother, "[o]n her own initiative," started conversation that led

---

[9]In *Connelly*, Connelly, prompted ostensibly by the "voice of God," walked up to a uniformed police officer and confessed a murder in graphic detail.

to defendant's confession); *United States v. Garlock*, 19 F.3d 441, 443 (8th Cir. 1994); *In the Interest of T.A.G.*, 663 S.E.2d 392, 395 (Ga. Ct. App. 2008) (stating, in a Fifth Amendment challenge to confession provided to assistant principal, that "[t]he test is whether the private individual, in light of all the circumstances of the case, must be regarded as having acted as an instrument or agent of the government when he produced the evidence" (citation and internal quotation marks omitted)).

The goal of the test, regardless of its name, is to determine whether "'the government exercised such coercive power or such significant encouragement that it is responsible' for the conduct of the private party securing the evidence, or that the exercised powers are the "'exclusive perogative of the government.'" *Garlock*, 19 F.3d at 443 (citation omitted). As indicated, the test requires consideration of two factors: "(1) whether the government has knowledge of and acquiesces in the [activity]; and (2) the intent of the party performing the [activity]." *Burroughs*, 926 S.W.2d at 246; *see also Day*, 591 F.3d at 683 (stating that "two primary factors" to be considered are: "(1) whether the Government knew of and acquiesced in the private individual's challenged conduct; and (2) whether the private individual intended to assist law enforcement or had some other independent motivation" (citations and internal quotation marks omitted)).

Here, the evidence established that Ms. Ackerman placed the telephone call to the defendant at the behest of Detective Robinson, who asked her to make the call "[t]o see if he was willing to provide any information." The call was placed from the police station, with Detective Robinson providing the telephone and arranging the recording equipment. Detective Robinson directed Ms. Ackerman to "[e]ngage in conversation and see if there was any information [she] could get." Ms. Ackerman testified that she had spoken to the defendant on several occasions prior to making the recorded call, but she had not questioned him about the victim's allegations.[10]

Although the trial court found that Ms. Ackerman had other, independent motivations for making the recorded telephone call, no evidence in the record supports this finding. Her role as the victim's mother certainly provided her with concerns different than the police relative to the victim, but the record does not support a finding that it was her concern as a parent that actually motivated or prompted her to make the call in this case. Instead, the record establishes that (1) the State not only acquiesced in the challenged conduct but actively encouraged it and (2) that Ms. Ackerman's motivation was the desire to procure a confession. An independent motivation was not established. The content of the call itself as well as the testimony of both Detective Robinson and Ms. Ackerman

_____

[10]This information comes from Ms. Ackerman's trial testimony. *See State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

-33-

preponderate against the trial court's finding that Ms. Ackerman was not a state actor when she attempted to gain the defendant's confession.

Accordingly, because Ms. Ackerman qualified as a state actor and because her conduct overbore the defendant's will to resist confessing, the trial court should have suppressed the audio recording of the telephone call as violative of the defendant's state and federal constitutional rights. That being said, we think that the error was harmless beyond a reasonable doubt given that the defendant's testimony at trial largely matched the admissions he provided during the telephone conversation. *Chapman v. California*, 386 U.S. 18, 24 (1967).

## B. Statements to Detective Robinson

The defendant also contends that his statements to Detective Robinson should have been suppressed because they were involuntary. He argues that the detective made a number of "misrepresentations regarding the outcome of the 'case'" that overbore the defendant's will and compelled him to incriminate himself. The State asserts that the detective's conduct was not improper. We agree with the State.

The defendant went to the police station voluntarily, and, following the provision of *Miranda* warnings, voluntarily engaged in a conversation with Detective Robinson. Although Detective Robinson attempted to minimalize the repercussions attendant to the victim's allegations in an effort to get the defendant to confess, he did not actually promise the defendant leniency. Detective Robinson offered the defendant the opportunity to tell his side so that the detective could present that information to the district attorney along with the evidence that the police had already obtained. He told the defendant plainly that the charging decision would be made by the district attorney. The detective did make several misrepresentations about the tenor of the State's evidence, but none of those misrepresentations led to the defendant's statements here. Under these circumstances, the trial court did not err by denying the defendant's motion to suppress his statements to Detective Robinson.

## V. Issues Regarding the Indictment and Judgments

As indicated, at the close of its proof, the State dismissed counts 6, 7, 9, 10, 11, 12, and 15. In addition, the State announced that it was amending the offense dates relative to counts 13, 14, and 16 so as to lower the charged offense from aggravated rape of a child to rape of a child. The record establishes, however, that counts 13, 14, and 16 never charged aggravated rape of a child and had always charged the offense of rape of a child. The written election of offenses contained in the technical record makes no reference to counts 13, 14,

and 16 and instead references counts 11, 12, and 15. It is not clear, however, that this written election of offenses was presented to the jury. The transcript of the jury's rendering the verdict indicates that the jury convicted the defendant of child abuse as a lesser included offense of rape of a child in counts 13 and 14 and rape of a child in count 16. The judgments contain no offense dates that might help bring some clarity. Counts 13 and 14 charge the exact same crime of child rape by fellatio and contain the same offense dates. Upon remand, the court should make every effort to ascertain that the charges submitted to the jury align with the election of offenses provided by the State and that none of the charges are duplicitious.

## *VI. Conclusion*

Because the trial court erred by admitting into evidence the video-recorded forensic interview of the victim and by admitting as substantive evidence the victim's statements to Ms. Ackerman, Ms. Miller, and Ms. Johnson, and because those errors cannot be classified as harmless, the defendant is entitled to a new trial. Although the trial court erred by denying the defendant's motion to suppress the audio-recorded telephone conversation between the defendant and Ms. Ackerman, that error can be classified as harmless beyond a reasonable doubt. Finally, the trial court did not err by excluding the testimony of Doctor Frumkin or by admitting into evidence the defendant's pretrial admissions to Detective Robinson. Accordingly, the judgments of the trial court are reversed, and the cause is remanded for a new trial.

_____
JAMES CURWOOD WITT, JR., JUDGE