# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs December 3, 2013

## STATE OF TENNESSEE v. MARQUEST MAYS

### Appeal from the Shelby County Criminal Court
### No. 09-00763    Lee V. Coffee, Judge

### No. W2012-00607-CCA-R3-CD  - Filed March 7, 2014

Marquest Mays ("the Defendant") was indicted for first degree felony murder during the perpetration of aggravated child abuse and aggravated child abuse. A competency hearing was held, and the trial court found that the Defendant was competent to stand trial. The Defendant proceeded to trial, and a jury found him guilty on both counts. Following a sentencing hearing, the trial court sentenced the Defendant to life imprisonment on the first degree murder conviction and dismissed the aggravated child abuse conviction. In this direct appeal, the Defendant contends that: (1) the trial court erred when it declared him competent to stand trial; (2) the evidence was insufficient to support the verdict; and (3) the trial court prevented him from presenting a defense when it excluded expert testimony regarding his vulnerability to giving a false confession. After a thorough review of the record and applicable law, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment
### of the Criminal Court Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Joseph S. Ozment (on appeal) and Larry Copeland (at trial), Memphis, Tennessee, for the appellant, Marquest Mays.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Amy P. Weirich, District Attorney General; Jennifer Nichols and Carrie Shelton, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

The Defendant was indicted by a Shelby County grand jury for one count of first degree murder during the perpetration of aggravated child abuse and one count of aggravated child abuse. In May 2011, upon motion of defense counsel, the trial court held a competency hearing.

Dr. Geraldine Bishop, an expert in clinical and developmental psychology, testified at the competency hearing that she performed an "extensive evaluation" of the Defendant's competency "consisting of interviews with [the Defendant], with his family, [and] with his employer." This evaluation included "an intelligence test, an academic achievement test, and an adaptive behavior scale." Based on her evaluation, Dr. Bishop testified, "It is my opinion that [the Defendant] is mentally retarded and that he is not competent to assist his attorney properly in the prosecution of this case." According to Dr. Bishop, this conclusion was based on a number of factors, including the Defendant's intelligence quotient ("IQ"), which she explained was "in the mentally retarded range," his impaired "verbal skills," and his limited "comprehension." In all of these areas, the Defendant was "functioning in the bottom one (1%) or two percent (2%) of the population at large." Dr. Bishop also testified that the Defendant had "a long history of attention deficit disorder" and had a "passive" personality style "of being eager to please others."

On cross-examination, Dr. Bishop agreed that the Defendant exhibited only "mild" mental retardation, which is the lowest level of mental retardation. Dr. Bishop testified that the Defendant did have some ability to understand the roles of the different participants at trial and that he "knew what the allegations [in this case] were about."

In response to a question posed by the trial court, Dr. Bishop stated, "I think [the Defendant is] capable of consulting with his lawyer." She added, however, that there was some question as to whether the Defendant could remember several hours of testimony "well enough to consult about that after the fact." She also testified that the Defendant had a "rational and factual" understanding of the charges against him.

The State called Dr. John Robert Hutson, who testified as an expert in forensic evaluations and clinical psychology. Dr. Hutson stated that he had performed two different evaluations of the Defendant. He agreed that the Defendant had "intellectual limitations," but he noted that the Defendant had "no psychiatric problems." According to Dr. Hutson, the Defendant provided satisfactory responses regarding the varied roles of the participants at trial. The Defendant's school records indicated that he had an IQ of sixty-eight, an IQ that

Dr. Hutson "felt comfortable with." Dr. Hutson concluded that the Defendant was competent to stand trial.

On cross-examination, Dr. Hutson testified that, following his second evaluation of the Defendant, he had noted that the Defendant had a "good understanding" of his attorney's role and "what options may be open to him." Dr. Hutson concluded that the Defendant was "competent to proceed as he understands the process, the charges, the potential consequences and has the ability to confer [with his attorney]."

In response to a question posed by the trial court, Dr. Hutson stated that the Defendant understood the potential consequences and the nature of the charges against him. He also believed that the Defendant's ability to assist his attorney in the preparation of his defense was "sufficient."

At the conclusion of the hearing, the trial court declared the Defendant competent to stand trial.

On October 5, 2011, the trial court held a pretrial hearing regarding a motion in limine filed by the State to "prohibit defense counsel from making any reference . . . to any 'false confessions' of the Defendant." From what we can discern from the record,[1] the State was notified of the Defendant's intent to call an expert witness to testify on the matter of false confessions shortly before the October 5 hearing, and the motion in limine was filed the same day of the hearing. The Defense's expert was not available to testify on that day. The trial court reasoned that the right to present such expert testimony:

> is not absolute; [and] the defense must comply with established rules of procedure and evidence; and the court has to consider whether or not the evidence is critical to the defense; whether or not the evidence bears indicia of reliability; and whether or not the interest, support, and exclusion of the evidence is substantially important.

Noting that it had "no idea what this expert might say," the trial court granted the State's motion pending a future hearing regarding the substance of the proposed expert testimony.

---

[1] We note that the record contains no written notice filed by the defense of intent to introduce expert testimony as required by Rule 12.2 of the Tennessee Rules of Criminal Procedure. See Tenn. R. Crim. P. 12.2(b)-(c) (requiring a "defendant who intends to introduce expert testimony relating to a mental disease or defect or any other mental condition of the defendant bearing on the issue of his or her guilt" to file written notice "within the time provided for filing of pretrial motions").

At that point, defense counsel notified the trial court that the proposed expert could be available to testify the next day, and the trial court set a hearing for the following afternoon.

On October 6, 2011, the proposed defense expert, Dr. Gregory DeClue, testified that he is a licenced forensic psychologist who specializes in the psychology of interrogations and confessions. Dr. DeClue confirmed that he was not able to give an "ultimate opinion . . . whether a confession was a false confession." Rather, he would be able to testify that "some people do falsely confess to crimes," that there is "clear evidence in undisputed cases" where people have falsely confessed to crimes which they did not commit, and to "what we can learn from those cases . . . and also how that can guide courts and judges and juries in terms of evaluating the evidence."

On cross-examination, Dr. DeClue testified that he had not yet completed his evaluation of the Defendant. He testified that, in his interviews with criminal defendants generally, he looks for certain "vulnerabilities to police pressures," "achievement in areas such as oral expression," "language skills," "reading skills," "mental health issues," "substance abuse or addiction," and "various types of stress." He also testified that he looks to see if the interrogating officers used certain "safeguards" to help prevent false confessions, such as recording the entire interview rather than just a portion.

In response to questions posed by the trial court, Dr. DeClue clarified the extent of his expert opinion: "I'm not planning to offer an opinion about whether anybody's confession is a false confession or not. I've never testified to that." Rather, he would "address the techniques that were used in this particular case," and "the vulnerabilities, if any, of this particular suspect." At the conclusion of the hearing, the trial court ruled that Dr. DeClue would be permitted to testify as "an expert in the field of forensic psychology."

The Defendant proceeded to a jury trial on October 10, 2011, and the following evidence was adduced:

Lasandra Beason testified that she hosted a party at her home on Friday, October 10, 2008. Lasandra's[2] cousin, Sharonda Willis, was at the party along with Sharonda's nineteen-month-old daughter ("the victim"), her two other children, and the Defendant, who was Sharonda's boyfriend at the time. There also were several other people at the party, several of whom were young children, including Lasandra's son. Another of Lasandra's cousins, ShaNika Beason, arrived to the party late, at approximately 11:30 p.m. Lasandra remembered how the victim was acting the night of the party: "[The victim] was fine. She

---

[2] Multiple witnesses in this case share common surnames. Therefore, to avoid confusion, we will refer to these witnesses using their given names. We intend no disrespect.

was happy. She was running back and forth from my son's room to the hallway and back playing." Lasandra testified that her son, her boyfriend, ShaNika, Sharonda, Sharonda's three children, and the Defendant all stayed the night at her house following the party. Lasandra remembered that Sharonda, ShaNika, and the Defendant all slept in the den. Sharonda's children slept in Lasandra's son's room in the back of the house ("the back bedroom").

Lasandra testified that the children only were allowed to play in the front yard and in the carport on the side of the house because the backyard "has a sewer in the back – like a little ditch" and overgrown grass. There was always a rule in the house "[n]ot to go in the back – [the children knew] not to go in the back." Lasandra identified photographs showing the condition of the backyard, the carport, and a gate which provided the only access to the backyard. Lasandra testified that the gate had a latch that made is inaccessible to small children.

The day after the party, Saturday, October 11, 2008, Lasandra and her boyfriend left the house early in the morning for work. Lasandra returned home around 3:10 p.m. When Lasandra arrived home, "Sharonda and [the Defendant] was [sic] sitting over by the window in my chair – one was sitting on the ottoman. And ShaNika was asleep on the couch." When Lasandra asked Sharonda where the kids were, Sharonda told her that the victim was in the back bedroom asleep. The other kids were in Lasandra's bedroom. Shortly after Lasandra returned home, Sharonda told her, "[The Defendant is] ready to go because his blood pressure is up." Lasandra dropped the Defendant off and returned home around 3:50 p.m. She went into the kitchen and began preparing dinner when Sharonda came in. Lasandra testified:

> Sharonda had walked up, looking into my kitchen, and she was like, "Lasandra."
>
> And I was like, "What?"
>
> And she was like – she didn't say anything – she had her hand over her head, like this, and I was like, "What?" She was like, "[the victim]?"
>
> And I said, "What's wrong with [the victim]?"
>
> She was like, "She's not breathing."

At that point, Lasandra stopped what she was doing and went to the back bedroom where she found the victim. She testified:

I seen [sic] [the victim] lying on her back with her arms out, her eyes lightly open, her skin color was blue, and her tongue was white. By that time, ShaNika woke up, and came in and seen [sic] what happened. And I walked over and touched – touched [the victim], and she was cold. She was ice – she was cold. And I told Sharonda to call 911.

When Lasandra left the room, she found Sharonda outside on the phone. When she asked Sharonda who she was talking to, Sharonda replied that she was talking to the Defendant. Lasandra said, "you stupid, I told you to call 911." Lasandra testified that she then called 911 herself. The dispatcher instructed Lasandra to perform CPR on the victim, and she performed CPR "for like ten or fifteen minutes" before paramedics arrived. Lasandra testified that she previously had been certified in CPR for her job. At that point, the State entered the tape-recording of Lasandra's 911 call into evidence without objection and it was played for the jury. Lasandra testified that the paramedics took the victim in an ambulance to Le Bonheur Children's Hospital.

When Lasandra arrived at the hospital, Sharonda and other members of the family were already there. She testified, "I believe the doctor came in and said that we could go in and see [the victim], but we couldn't touch her. So we all proceeded to go to the room. . . . We went in there, and [the victim] was lying down with a sheet over her and nothing but her head showing." Lasandra testified that the Defendant was at the hospital at that time, but she could not recall if he came into the room to see the victim.

Lasandra testified that she was interviewed by officers at the Memphis Police Department ("MPD") the next morning. She remembered that the officers transcribed her statement and that she signed it.

On cross-examination, Lasandra testified that, during the time she was waiting for the paramedics and performing CPR on the victim, she did not know where Sharonda was. Sharonda did not assist in performing CPR. Lasandra could not recall where Sharonda was during the time the paramedics took the victim to the ambulance. Lasandra testified that none of the voices screaming and crying in the background of the 911 call was Sharonda's.

Christie Beason testified that she is Lasandra's sister and Sharonda's cousin. On October 11, 2008, around 2:00 p.m., Christie dropped off her son, Cordell, at Lasandra's house. She was certain that it was 2:00 p.m. because she dropped Cordell off at Lasandra's house at that time every day. She testified that, although Cordell was an adult at the time, he was developmentally disabled and needed supervision, so she walked with Cordell into the house. When she entered the house through the carport door into the kitchen, Christie saw "all the kids except [the victim]." Sharonda was standing at the stove in the kitchen.

From her perspective, Christie could see the Defendant sitting in a chair in an adjacent room. She also could see down the hallway leading to the back bedroom. When Christie asked Sharonda where the victim was, the Defendant "got up and went down the hallway" into the back bedroom. Christie testified that she had not heard any crying or other noises come from the back bedroom before the Defendant started towards it.

On cross-examination, Christie clarified that she did not hear any noises come from the back bedroom during the time the Defendant was in the room. She did not stay long enough to see the Defendant leave the room.

Clifford O'Conner testified that he was working as a paramedic for the Memphis Fire Department ("MFD") on October 11, 2008, when he responded to a call at Lasandra's house. O'Conner and other paramedics working for the MFD arrived at the house at 4:21 p.m. When he entered the house, O'Conner saw the victim "lying on the floor on her back" in the living room while Lasandra attempted to perform CPR. One of the paramedics moved Lasandra out of the way and took over CPR. O'Conner observed that, at the time he arrived, the victim was "lifeless. She was not breathing. She was pulseless." The victim was moved to the ambulance where O'Conner intubated her. The victim was attached to a cardiac monitor and registered no heartbeat. O'Conner continued efforts to resuscitate the victim until she was transferred to the hospital. Throughout that time, the victim never registered a heartbeat.

O'Conner testified that nothing he or the other paramedics did in their efforts to resuscitate and transport the victim could have resulted in a broken bone in her arm, nor could it have caused damage to her liver, pancreas, or spleen. O'Conner testified that he did not notice any injuries on the victim.

On cross-examination, O'Conner testified that he took a statement at the scene and summarized it in his subsequent report: "The patient's mother stated she put the patient in bed for a nap approximately one hour ago; and that was the last time she noted that the patient was breathing."

Sharonda Willis testified that the victim was her daughter. She also had two other children. Sharonda was the cousin of Lasandra, Christie, and ShaNika. In October 2008 the victim was nineteen months old. Sharonda testified that she met the Defendant on a "chat line" in May 2008, and they began talking on the phone on a regular basis. Sometime in June or July 2008, they began meeting in person. In one phone conversation during this period, the Defendant, hearing the victim crying in the background, commented, "If that was my daughter and she was that spoiled, I would hang her upside down and beat her."

They had met in person three times before Sharonda and the Defendant went to the party at Lasandra's house. Sharonda testified that, when the Defendant saw her friend at the party, the Defendant remarked that her friend was "fine" and asked Sharonda, "What the hell happened to you?" These comments hurt Sharonda's feelings.

Sharonda testified that she and the Defendant spent the night together on the floor in the den. At about 7:00 a.m., she was awakened when the victim came into the den crying. She testified, "[the victim] came in and she laid on my arm and went back to sleep." That morning, the victim appeared to be "fine." Sharonda testified that, at some point that morning, the Defendant asked her if she was "still upset" regarding the comment he made the night before. Sharonda recalled that, when she refused to talk about the incident, the Defendant said, "Okay, so that's how it's going to be. Okay. You gonna [sic] wish you . . . I got you . . . you're gonna [sic] wish you had said something to me."

Sharonda testified that, as the day progressed, the children were "in and out" playing inside the house and outside in the carport. At times, the Defendant was outside with the children while they were playing. At one point, Sharonda and the Defendant were in the carport standing next to the victim who was sitting on the trunk of a car. She testified that the Defendant "tapped [the victim] on her leg" in such a way that "a parent would be concerned." She told the Defendant, "You shouldn't – don't hit her because you're not her father."

Sharonda testified that, at one point when she was inside and the Defendant was outside with the victim:

> I heard [the victim] scream, so I went outside, and when I went outside, [the Defendant] was coming from the backyard with [the victim]. She was crying. I asked him what was wrong. He said that she got caught in the fence – she went in the backyard, and the fence closed on her, and she got afraid.

When she had this conversation with the Defendant, he was walking through the gate into the carport, closing the gate behind him. The Defendant was holding the victim. Sharonda noticed that the victim "had grass and dirt on her hair and on the back of her clothes." According to Sharonda, the Defendant claimed that the victim "got caught in the fence." Sharonda acknowledged that, in an earlier statement to police, she had stated that the Defendant claimed that the victim "fell in the grass." She testified that, because of the way the gate operated, the victim could not have opened the gate by herself. Sharonda took the victim back into the house, gave her to ShaNika, and went back into the kitchen to get the other children some water.

-8-

Sharonda testified that, when she left the kitchen and went back in the den, the victim still was crying. Sharonda "didn't notice any condition or [that] anything was wrong" with the victim. She held the victim for "two or three minutes" before the victim fell asleep. At that point, Sharonda put the victim in a chair and went back into the kitchen. Eventually, the victim woke up and started towards Sharonda in the kitchen. The Defendant said, "Come here," and the victim went to him. The Defendant took the victim and sat with her in the living room. Sharonda could not recall how long the Defendant was alone with the victim in the living room.

The next thing Sharonda remembered was that the Defendant said, "Babe, she's asleep," referring to the victim. Sharonda told the Defendant to "go lay her down" in the back bedroom. Sharonda testified:

> [The Defendant] took her to [the back bedroom], and he was back there with her, and he came back up to the front; and I was in the kitchen fixing me a sandwich; and as I was fixing me a sandwich, I heard another whine – I heard a whine – I thought she stopped, and I heard a whine again. And when I was coming out the kitchen, [the Defendant] walked past me fast and went back there to where she were [sic].

Sharonda testified that she did not ask the Defendant to go check on the victim. The Defendant never had been the victim's babysitter before and only had met her briefly on one other occasion prior to October 10, 2008. Sharonda followed the Defendant to the back bedroom. She stood in the doorway while the Defendant patted the victim on the back. Sharonda asked the Defendant if the victim was asleep, and the Defendant replied "[y]eah, she went back to sleep."

When Sharonda was back in the kitchen, the victim "started whining again." Sharonda testified, "[the Defendant] went back. And he was back there, I heard a smack noise. And I went back there, and I asked him, 'What was that?' He said he didn't know." The victim appeared to be asleep. Sharonda went back into the kitchen to finish making her sandwich, and the Defendant returned to sitting in the living room.

Sharonda testified that, when Lasandra returned home from work, "immediately [the Defendant] was ready to go." The Defendant asked Lasandra to take him home because he needed to take his blood pressure medicine. A "short time after he left," the Defendant called Sharonda and "asked had we checked on [the victim]." Sharonda testified that the phone call surprised her. When she confirmed that she had not checked on the victim because she was still asleep, the Defendant said goodbye and hung up.

Eventually, Sharonda went to check on the victim. She found the victim lying on the bed on her stomach. Sharonda testified, "I walked up to the bed, and I looked at her back, and it wasn't moving. So I looked at her again, and I flipped her over . . . . Her tongue was out and her mouth was blue. And she was not breathing." Sharonda testified that she was "in shock" and that "the best [she] could do" was go to the kitchen to tell Lasandra what had happened. After she told Lasandra that the victim wasn't breathing, "[Lasandra] went into the room, and she saw [the victim], and [Lasandra] started screaming herself. And then they picked her up and [Lasandra] was coming up the hall, and ShaNika was coming out the [sic] den. Then ShaNika grabbed [the victim], and Lasandra was calling 911."

Sharonda testified that ShaNika put the victim on the couch in the living room. According to Sharonda, she attempted to call 911, but the call "didn't go through." At that time, she called the Defendant. According to Sharonda, Lasandra already was talking to 911 dispatchers when she decided to call the Defendant. When Sharonda called the Defendant, the Defendant's grandmother answered. She told the Defendant's grandmother that the victim was not breathing. The Defendant's grandmother gave the phone to the Defendant. According to Sharonda, the Defendant said, "What you mean [sic] she's not breathing?," and she responded that she did not know. The Defendant asked if she had called 911, and she told him that paramedics were on the way.

The victim was taken by ambulance to the hospital. The Defendant came to the hospital with his cousin and his grandmother. Sharonda testified that she had three phone conversations with the Defendant on October 11, 2008, after leaving the hospital. In those conversations, "[the Defendant] was saying how sorry he was, and he was giving me sympathy." Sharonda testified, "[H]e was questioning me – he asked me had they said his name? – had they brought him up – or things like that." In those conversations, the Defendant also asked if Sharonda had "talked to the medical examiner."

On October 12, 2008, Sharonda was interviewed by Officer Quinn with the MPD. Sharonda stated that she did not hurt the victim or do anything that could have caused the injuries that the victim suffered. On that day, Sharonda talked to the Defendant multiple times by phone, and he repeatedly asked her whether she had "heard anything from the medical examiner."

On cross-examination, Sharonda testified that, when she encountered the Defendant coming from the backyard with the victim, the victim was crying, and she took the victim from the Defendant and brought her inside. At that time, the victim "had dirt and grass . . . on her hair to her back." However, she did not notice anything else wrong with the victim, and the victim did not appear to be injured.

-10-

She testified that, after she heard the "smack" noise and went to check on the victim, she found her asleep with the Defendant patting her on the back. She agreed that, had the Defendant smacked her, the victim would not have been asleep. However, she did not know whether the smack noise could have been related to what the Defendant was doing with the victim on the bed.

She could not remember whether Lasandra had asked her to make the 911 call. She clarified that, when she tried to call 911, the reason she could not get through was because ShaNika's phone "kept losing reception, and the call kept dropping." She called from outside in the carport because ShaNika's phone could not get any reception in the house. She gave up calling when she realized that Lasandra had reached 911 on her phone. She did not recall if Lasandra ever came outside and asked her whether she had called 911.

At no time on October 11, 2008, did Sharonda notice that the victim had any obvious injuries.

On redirect examination, the State entered Sharonda's October 12, 2008 statement into evidence.[3] In that statement, Sharonda claimed that the Defendant was the one responsible for the victim's death. In her statement, Sharonda recounted the incident when the Defendant was carrying the victim back from the backyard:

> I heard [the victim] scream. I went outside the kitchen door to see what happened, [the Defendant] was coming from the back of the house with [the victim] in his arms. She was crying. . . . [The Defendant] said that [the victim] went in the backyard and the gate locked on her, and she got scared. I saw that [the victim] had grass and dirt in her hair and on her clothing.

Also in that statement, Sharonda stated that the gate to the backyard was difficult to open because "part of the latch was broke [sic] off" and "because the grass is so high there." She stated that the gate could not have swung closed by itself, as it had to be closed manually.

ShaNika Beason[4] testified that Lasandra, Sharonda, and Christie are her cousins. On October 10, 2008, she attended the party at Lasandra's house. When she woke up the next morning to get something to eat, she encountered the victim who was walking towards the back bedroom with a corndog in her hand. She testified that the victim was like a daughter

---

[3] The statement was entered under Tennessee Rule of Evidence 803(26).

[4] By the time of trial, ShaNika Beason also went by the name ShaNika Maclin.

to her, saying, "I practically, you know, raised her – washed her – fed her – helped Sharonda out with her a lot." After ShaNika ate, she again fell asleep in the den.

Later in the day, ShaNika was washing her hair when she heard "like a little moan – heard [the victim]." She testified that she asked Sharonda and the Defendant if they had heard the victim, and the Defendant replied, "I'm fixin' to get up and go in there and check on her." The Defendant then went into the back bedroom. Shortly thereafter, ShaNika "heard a moan again." She testified:

> I moved – I looked because it's unusual for [the victim] to [moan] twice and didn't get down out the bed [sic] looking for me . . . . And I'm like, that's unusual for [the victim] to be – you know, to moan twice and didn't get down. No one thought anything about it. And that's when I met [the Defendant] coming out of the [back bedroom] because I took it upon my – I'm like, "that's not like [the victim]." I was getting ready to go back there. He came out the [sic] room and stopped me. He's like, she sleep [sic] – she went to sleep. I still stayed there, and I listened to see if she were she gonna [sic] say something again. And she didn't.

At that point, ShaNika remembered saying to Sharonda, "Dang, you finally got you a man that will help you watching you [sic] kids. . . . He seems pretty concerned about [the victim]." And Sharonda "laughed it off." ShaNika went back to sleep.

ShaNika testified that she woke up when the Defendant was leaving, and fell back asleep. She was awakened again when Lasandra returned from work. She testified:

> [A]nd then I heard Lasandra scream. I jump up at the door, and I was like, "What's going on." [Lasandra] was running down the hallway and grabbed Sharonda and was like, "What happened? – what happened? – what happened?" And I went to the back, and that's when I saw [the victim], she was on her back. Her arms was [sic] stretched out. Her eyes was [sic] halfway rolled in the back of her head. She was kind of pale in the face. Her mouth was bluish; and all I could do was just start crying. And I grabbed her. And I was like, "Baby, breathe," because I'm thinking she had an asthma attack or something. . . . She wasn't moving. I grabbed her . . . and I walked to the front, and I turned into the kitchen; and when I turned into the kitchen . . . I collapsed in the floor with [the victim] in my hands . . . and [Lasandra] is screaming, "Call 911 – call 911."

ShaNika testified that "Lasandra was telling Sharonda to call 911," and "Sharonda was leaning over the dryer on the phone," but ShaNika "didn't know whose phone she was on." Lasandra asked Sharonda with whom she was talking on the phone, and Sharonda said she was on the phone with the Defendant. ShaNika went to get her phone, and that is when she realized that Sharonda was using her phone. At that point, Lasandra called 911. ShaNika laid the victim on the couch, where Lasandra performed CPR on her.

ShaNika testified that she went to the hospital after the paramedics took the victim in the ambulance. On the way to the hospital, the Defendant called her phone "several times." The Defendant said, "How is [the victim] doing? Is she okay? Is she breathing?" The Defendant hung up with her and called Lasandra and then called ShaNika back multiple times. When ShaNika arrived at the hospital, she was informed that the victim had died.

On cross-examination, ShaNika testified that, when the Defendant was checking on the victim, she was "suspicious of it," saying "that's why, the second time, I walked up to the room." She never made it to the door because she encountered the Defendant halfway, but her suspicion led her to wait there a moment to see if she heard the victim again.

Dr. Lisa Funte testified that she worked as a medical examiner at the Shelby County Regional Forensics Center. Dr. Funte performed an autopsy on the victim on October 12, 2008. In her external investigation of the victim's body, Dr. Funte noted abrasions on the victim's cheek and on the right side of her abdomen. She also noted that the victim's "left arm, near her wrist, appeared slightly swollen and somewhat deformed."

In her internal investigation of the victim's body, Dr. Funte discovered a "fair amount" of blood in the abdominal cavity. She began looking for the source of the bleeding, and found that "the liver was lacerated or torn," "[t]he spleen was lacerated or torn," and the pancreas was "lacerated to the point of being transected or basically split in half." Dr. Funte concluded that the blood in the victim's abdominal cavity resulted from these injuries to the victim's internal organs. Dr. Funte testified that a laceration or tear to the liver, spleen, or pancreas would result in a significant amount of internal bleeding. According to Dr. Funte, any one of these three injuries to the victim's internal organs, taken alone, would have resulted in death. Based on her observations, Dr. Funte concluded that "[a]ll of these injuries appeared acute and to be what we consider perimortem which means occurring at or about the time of [the victim's] death."

Dr. Funte testified that, after having sustained the trauma to her organs, the victim still would have been able to walk and cry. She stated, however, that the injuries to the victim's internal organs probably would have resulted in "significant impairment and death within maybe half an hour." Dr. Funte also testified that the injuries the victim sustained were

consistent with "trauma occurring from the front . . . upper part of [her] abdomen." In Dr. Funte's opinion, the injuries the victim sustained were the result of "non-accidental blunt force trauma," consistent with punching. She testified that, due to the extent of internal injuries, "it would be unlikely" that they could have been caused by only one blow. She testified, "pancreatic injuries – especially transection is very rare. It takes a lot of force to transect that pancreas." This led her to conclude that "there was a great deal of force involved." She testified that it would be "very unlikely" that the injuries to the victim's internal organs could have been caused by someone performing CPR on her.

In addition to these injuries, Dr. Funte also discovered that the "radius and the ulna on the left [arm] were fractured. And there was a bruise on the back right side of the head." However, she noted that the bruise was not visible to the naked eye and only became apparent during her examination. She noted that neither the broken arm, nor the bruise on her head, would have been fatal injuries. Dr. Funte also testified that she did not find any evidence of old or healing injuries.

Dr. Funte testified that, although the broken arm would have hurt, the injuries to the victim's internal organs were not likely to have hurt because of the lack of pain receptors in internal organs. Therefore, Dr. Funte testified that she would not be surprised if there was only "whimpering" rather than "screaming" or "yelling" as a result of those injuries.

Dr. Funte testified that the swelling resulting from the victim's broken arm was "mild" and that she would not be surprised if it was not detected by paramedics.

On cross-examination, Dr. Funte testified that the type of fracture in the victim's arm was unlikely to be caused by a simple fall or by her arm being "snatched and grabbed up." She agreed that, although the injuries to the internal organs would not have caused any pain, there would have been "some discomfort from the blow or the compression of the abdominal wall." When asked whether it was possible that the victim's injuries could have been caused by "a very heavy person – say over two hundred pounds" jumping on the bed and landing on her "with their foot coming down full force," she agreed that it was possible. She also agreed that the injuries to the liver and the spleen possibly could have been caused by someone performing adult CPR technique, which would be inappropriate for a child the victim's size. However, she noted that it was "very unlikely" this could have resulted in the injury to the pancreas.

On re-direct examination, Dr. Funte clarified that she did not believe that the victim's injuries were caused by CPR but rather that they were the result of "non-accidental blunt-force trauma."

-14-

Officer Maurice Davis with the MPD testified that he was working as a patrol officer on October 11, 2008, when he responded to an "assist call" at Lasandra's house. When he arrived, paramedics were working on the victim, and his job was to gather information and "control the scene to keep the crime scene from being contaminated." He was present when the crime scene investigation unit arrived.

On cross-examination, Officer Davis testified that he spoke with Sharonda while he was at the crime scene. He testified that Sharonda stated that "she laid her baby down in the bed" about 2:45 p.m.

Officer Demar Wells with the MPD testified that, on October 11, 2008, he responded to the hospital as a crime scene investigator. He took photos of the victim and the clothing she was wearing. He also collected the clothing.

Sergeant Robert Edwards with the MPD testified that he was called to Lasandra's house on October 11, 2008, as part of the "felony response" team. Sergeant Edwards identified photographs of the back bedroom.

On cross-examination, Sergeant Edwards testified that he spoke with Sharonda on the night of October 11, 2008, at the hospital, and she indicated that "[the victim] had fallen asleep in [the Defendant's] lap, and she told him to put her – put her in the bed."

The victim's sister ("Sister"), who was six years old at the time the victim died, testified that, on October 11, 2008, she was outside playing in "the go car" with the victim when "some man came out and grabbed [the victim]." The man she was referring to was Sharonda's "friend" whose name started with "Mar." She continued:

> Then he walked toward the gate, and he put her down and unlocked the gate with his nail. . . . then he got it opened, and he picked [the victim] up and went in the back, and then she started crying. . . . And then he put her down and locked the gate back.

She testified that she could not see what happened in the backyard, but she heard a "bump." She explained, "I heard a noise. . . . It was like something hit the back of the house." After she heard the noise, she saw the man come back from the backyard carrying the victim.

On cross-examination, Sister characterized the noise that she heard come from the backyard as "a boom" and compared it to a firecracker boom. The man came walking back to the carport from the backyard holding the victim about ten seconds after Sister heard the noise. At the time all of this occurred, there were no other adults present.

-15-

Sergeant Kevin Lundy testified that, while working as an investigator in the homicide bureau of the MPD, he was assigned as the "case coordinator" in the investigation into the victim's death. He interviewed the Defendant on October 12, 2008. He testified that the Defendant was read his Miranda rights and signed an advice of rights form indicating that he understood his rights.

Sergeant Lundy testified that the Defendant admitted to being at Lasandra's house on October 11, 2008. When asked what happened to the victim, the Defendant gave several different explanations that "didn't really seem believable based on the information that [he] received from Dr. Funte" regarding the victim's injuries. One of the explanations the Defendant gave was that the victim was sitting on the hood of a car and slid off, falling onto the concrete. When Sergeant Lundy told him that the account was not consistent with Dr. Funte's findings, the Defendant gave another explanation that the children were in the backyard playing and that the victim got stuck in the gate when it swung back closed. The Defendant also gave a third explanation that the victim was crying and that the Defendant "was squeezing her like maybe trying to comfort her, and he was squeezing her and squeezed her too tight." Each time, Sergeant Lundy told the Defendant that the story was not consistent with Dr. Funte's findings regarding the victim's injuries.

Eventually, Sergeant Lundy decided to have Sergeant Mundy Quinn take over the interview because he believed a "fresh face" would aid the process. Sergeant Lundy watched and listened to the interview from another room. When Sergeant Quinn told the Defendant that the explanations he had given were not consistent and that he needed to tell the truth, the Defendant "just dropped his head and started crying. And [the Defendant] said, 'I didn't mean to hurt her.' [The Defendant] said, 'I only hit her twice.'"

At that point, Sergeant Lundy took a typed statement from the Defendant. The statement was printed, and the Defendant signed it after reading it. In pertinent part, the Defendant's statement read as follows:

Q: Are you the person responsible for [the victim's] death?

A: Yes sir.

Q: Can you tell me what you did to cause [the victim's] death?

A: Punched her with my fist in the stomach 2 times.

Q: Tell me in your own words, what happened prior to, during, and after you came into contact with the police?

A: Sharonda was doing Shanika hair [sic] and [the victim], her baby, wouldn't stop crying so I got the baby and the baby still wouldn't stop crying. So I grabbed [the victim] and went to the back room and she still wouldn't stop crying so I proceeded to try and put her to sleep, but it didn't work. So I punched her one time in her stomach and I did it a second time and I laid her down and went in there with the girls. . . .

Q: When you first picked the victim up, did you snatch her up by her hand?

A: Yes, but I don't remember which hand.

Q: During the time that you punched [the victim], were you holding her or was she laying on the bed?

A: I was holding her.

. . .

Q: Did you ever tell Sharonda what you had done?

A: No sir, cause [sic] at the present time, I thought she went to sleep.

Q: What did [the victim] do after you punched her the second time?

A: When I punched her the second time, she looked at me and her eyes kind of rolled back in her head like she was going to sleep. That's when I laid her down.

. . .

Q: Is there anything else you would like to add to this statement that would aid us with this investigation?

A: I'm sorry for what happened to her. I did not mean for that to happen. I swear to God I didn't. If God and her could just forgive me.

Following his statement, the Defendant was placed under arrest.

-17-

On cross-examination, Sergeant Lundy clarified that, during the interview, he never told the Defendant the manner of injuries that the victim had received. No audio or video recording was made of the interview.

Sergeant Mundy Quinn testified that he was working for the MPD homicide bureau when he was assigned as a supporting investigator on the investigation into the victim's death. He conducted the interview of Sharonda on October 12, 2008. At one point during Sergeant Lundy's interview of the Defendant, Sergeant Quinn was asked to step in and interview the Defendant. When he entered the interview room, Sergeant Quinn could see that the Defendant's "eyes were tearing up" and that "he looked like he was wanting to talk. You know, something was weighing on his mind." Sergeant Quinn moved his chair around "to the end of the table" so that he was next to the Defendant and told the Defendant that the stories he had been telling did not match up with their information, telling the Defendant, "You just need to tell the truth." At that point, the Defendant "started to cry," and the Defendant stated, "I hit her twice – she was crying – I didn't mean to hit her that hard." After that, Sergeant Quinn left the interview room.

Following Sergeant Quinn's testimony, the State rested its case in chief.

At that point, the trial court held a hearing regarding the admissibility and scope of Dr. DeClue's testimony. The defense made an offer of proof, as Dr. Declue had concluded his evaluation of the Defendant by that time.

As a part of the offer of proof, Dr. DeClue testified that he had interviewed the Defendant and reviewed the Defendant's statement. Dr. DeClue testified that several factors come into play regarding a person's vulnerability to give a false confession, including: "[y]outh or immaturity;" "intelligence, for example someone who scores in the mentally-retarded range;" "[o]ther developmental disabilities;" "[o]ther cognitive disabilities;" "[m]ental illness;" and "[p]ersonality factors, especially including suggestibility and compliance." Dr. DeClue noted that he performed multiple tests on the Defendant and recorded the results in a written report.[5] He also performed an intelligence test on the Defendant and concluded that the Defendant's IQ was "in the 60s," placing him "in the mentally retarded range." Additionally, he performed a test of memory and malingering referred to as "TOMM," on which the Defendant received a "perfect score which shows that he was giving – he was trying to give the right answer." Among the other tests Dr. DeClue performed on the Defendant were the "Weschler Adult Intelligence Scale," the "Woodcock Johnson Test of Achievement," "the Gudjonsson Suggestibility Scale," and "the instruments

_____

[5] Dr. DeClue's written report is not included in the record.

-18-

for assessing, understanding, and appreciation of Miranda rights." However, Dr. DeClue did not testify to the results of any of these other tests.

In response to a question posed by the trial court, Dr. DeClue summarized the extent of his proposed testimony:

> Although I would not offer an [ultimate] opinion about whether he – his statement was true or false, I would be able to offer facts and opinions that would be relevant to the jury's decision about whether the statement was true or false. And some of my testimony that would be relevant to that would be characteristics of [the Defendant], including his IQ, other test scores, and other things that we've discussed; and others would be about techniques that the police used that could help them in their decision about how much weight to give to some of the evidence . . . .

Based on this testimony, the trial court ruled that Dr. DeClue could testify to "all the factors that a jury can consider as to whether or not a person who gives a statement is susceptible to influence," the "generalities of all the factors that might influence a statement or whether or not a statement may be, in fact, true," the "techniques" used by investigators in this case, and the "general testing methodology" used. However, the trial court concluded, "Dr. DeClue will not be able to testify that he performed specific tests on [the Defendant]."

In support of this conclusion, the trial court reasoned, in part, that Dr. DeClue's testimony specific to his testing of the Defendant was "speculative proof" because it was not conclusive enough as to the Defendant's mental capacity. That is, the testimony "would not be relevant because it does not make any issue that would be before the jury more or less probable," and, if presented, "the danger of unfair prejudice would substantially outweigh any probative value of what would be speculative testimony." Furthermore, the court reasoned that the testimony, if allowed, would "not be fair to the administration of justice," as it would "put the State of Tennessee in a position where they could not rebut that testimony."

Following this ruling, the defense began presenting its case.

Anne Mays testified that the Defendant is her grandson. She testified that, while at home on October 12, 2008, she received "[a]bout four, five, [or] six" phone calls from Sharonda. In one of those calls, Sharonda stated that "she couldn't get her baby to stop crying." Anne also related that Sharonda "said the baby was playing and fell down in the front room" and that "the baby had hit her head on the stool in the front room or something like that." Yet, in a subsequent phone call that day, Sharonda stated that "she gave the baby

the corn-dog, it calmed her down, and she started back to playing." When Sharonda called her again to tell her that the victim would not stop crying, Anne suggested that she call paramedics. The next time Sharonda called Anne, "[Sharonda] said 'the baby is not breathing.' And I said, 'Well, talk to the paramedics.' Then . . . she called back again, and she said, 'Oh, now they got the baby to breathe.'" In the final phone call, Sharonda called Anne from the hospital and told her "that the baby was not breathing."

When the Defendant returned from the store and Anne told him what Sharonda had been saying on the phone, the Defendant told Anne that they should go to the hospital. When they arrived, the Defendant tried to "console" Sharonda.

On cross-examination, Anne admitted that she was not entirely clear on the time frame or order of the phone calls. She acknowledged that, in an earlier interview with defense counsel, she stated that all of Sharonda's phone calls came between 5:00 p.m. and 5:15 p.m., which would have been after the victim was rushed to the hospital.

Dr. DeClue then testified in front of the jury regarding certain factors that he claimed might make a person "vulnerable to police pressure techniques." He stated that, in a study involving false confessions, it was found that mentally retarded individuals "may be something like ten to twenty times" more likely to give a false confession. He also stated that suggestibility and compliance are factors that one must take into account when considering an individual's vulnerability to giving a false confession. Compliance is when a person "makes a false confession even though he didn't do it and he knows he didn't do it at the time," and suggestibility is when a person "actually come[s] to doubt their memories and actually believe they may have done something they didn't do." Dr. DeClue also opined that mental illness is a factor that can lead to a false confession.

Additionally, Dr. DeClue testified that, when considering whether a confession might be false, police tactics used during the interview "can be crucial –they can make all the difference in the world." Specifically, he talked about the "Reid Technique" where officers attempt to read the body language of suspects, commenting that "the research says [this technique] doesn't work" and can lead to a "guilt-presumptive interview or interrogation strategy." He explained a variety of "maximization techniques" that police interrogators use to convince a suspect that they know he is guilty. One thing that interrogators also do is to isolate a suspect for a certain period of time, so as to "increase the level of anxiety." Dr. DeClue testified that the officers in the instant case used such techniques. Specifically, he noted that "this is a long interrogation with an isolated suspect" and that the officers employed the technique of "not accepting the first version of the statement that [the Defendant] made" and then encouraging him to give another version. In Dr. DeClue's

opinion, when a person changes their statement under these circumstances, it indicates that "the person is complying with the pressure from the police."

Reviewing the Defendant's written statement, Dr. DeClue testified that it was not "a transcript of what actually transpired," stating that, "they really didn't create a record that showed what really happened" because there was no audio or video recording and because only the last portion of the interview was included in the written statement. He stated that, because there is nothing to show what happened during the earlier portion of the interview, "we don't know how [the Defendant] got to that point where he made this statement." He added that "the greatest consensus" about what can be done to prevent false confessions is to record the entire interview.

On cross-examination, Dr. DeClue agreed that he could not testify whether the Defendant's statement was in fact a false confession. He confirmed that he had not spoken with any of the interrogating officers or the transcriptionist present during the Defendant's interview.

In response to a question posed by the jury of whether, based on the testimony at trial and the Defendant's confession, he "fel[t] that any tactics of influence were used to cause [the Defendant] to sign a statement of guilt," Dr. DeClue replied, "I don't know."

The Defendant testified that he arrived at Lasandra's house around 7:00 p.m. on October 10, 2008. He recalled making the statement that Sharonda's friend was "fine as hell" and asking Sharonda, "what happened to you?" According to the Defendant, Sharonda became "mad" after that statement and "stormed out" of the room. He claimed that he played video games most of the night and drank enough alcohol that he "became kind of tipsy a little bit." He remembered falling asleep in the den on the couch. When he woke up at some point during the night, he, Sharonda, and the victim were on the floor, and he slept the rest of the night there.

The Defendant testified that, on the morning of October 11, 2008, the kids were "just all over the place" playing. He stated:

[The victim] was constantly crying; and so [Sharonda] was getting irritated . . . . Sharonda was like, "Give me a second. I'm fixing to feed you." So, Sharonda hit her, and like I said, I'm sitting inside the living room, and she let her down, and she kind of dosed off. But she'd be back up as soon as her mama laid her back down. So, that's when I got up and said [to the victim], "Come here . . . ." I got [the victim] and put her across my lap. I was tapping my leg and patted her, and she falls [sic] asleep.

-21-

. . .

> I told Sharonda – I said, "Baby, she's sleep [sic]." She said, "Okay, take her in the back room." So me and Sharonda went to the back room, and I laid her down.

The Defendant denied that anything occurred involving he and the victim outside while the victim was sitting on the hood of a car or involving he and the victim in the backyard.

The Defendant testified that, when Lasandra returned home from work, he was having migraine headaches and asked Lasandra to drive him home. He recalled that, later that day, he spent some time at a friend's house. When he arrived home, his grandmother told him, "You need to call Sharonda because Sharonda says that her baby wasn't breathing." When he called her, Sharonda told the Defendant, "My baby ain't breathing." The Defendant asked her if she had called paramedics, and Sharonda replied that she had called him first. The Defendant advised her to hang up and call paramedics. Later that day, the Defendant traveled to the hospital to "comfort" Sharonda and to see the victim's body.

The next day, the Defendant was on the phone with Sharonda, and she told him that the MPD homicide bureau wanted the Defendant "to come down for some questioning." According to the Defendant, he replied, "Okay, if there's anything that I can help you with, just let me know." A short time later, officers with the MPD picked up the Defendant from his grandmother's house, handcuffed him, and brought him to the homicide office for questioning. The officers placed him in a large interview room and left him there "for a long period of time." Eventually, Sergeant Lundy came into the room and began asking him questions. According to the Defendant, he was not shown the advice of rights form "until after [Sergeant Lundy] got through yelling and fussing at [him]," and the form was never read to him. The Defendant testified, "[Sergeant Lundy] told me his name and asked me what happened. So, I told him what happened. The next thing I know, he just flipped out." The Defendant denied ever telling Sergeant Lundy the alternate stories about what happened to the victim.

The Defendant recalled that, eventually, Sergeant Quinn came in the room and began talking with him. According to the Defendant, "At that time, I had been there so long, I was scared, tired, flustrated [sic], still confused because Lundy, at the point in time, had showed me like a diagram of a body and was telling me that I was the one who caused the injuries to [the victim]." The Defendant testified, "The only reason why I gave that statement is because I just wanted to get everything over. . . . I was just ready to get the situation over with so they could stop the yelling and fussing that they were doing." The Defendant denied ever hurting the victim.

In rebuttal, the State called Penny Brown. Brown testified that she worked as a "civilian transcriptionist" for the MPD. She testified that she transcribed the Defendant's statement on October 12, 2008. According to Brown, she typed the statement "verbatim," the statement was printed out, and the Defendant was given a chance to make any changes he deemed appropriate before signing it. Brown testified that the transcription was a true and accurate reflection of the questions posed by Sergeant Lundy and the responses given by the Defendant.

On cross-examination, Brown agreed that she was not present for the entire interview and only was brought in at the time the Defendant was ready to make a statement.

Following deliberations, the jury found the Defendant guilty of one count of first degree felony murder during the perpetration of aggravated child abuse and one count of aggravated child abuse. The Defendant was sentenced to life imprisonment for his conviction of first degree murder during the perpetration of aggravated child abuse, and his conviction of aggravated child abuse was dismissed by the trial court on double jeopardy grounds. The Defendant filed a motion for new trial, which the trial court subsequently denied. The Defendant filed a timely notice of appeal.

In this direct appeal, the Defendant raises the following issues: (1) the trial court erred when it declared him competent to stand trial; (2) the evidence was insufficient to support the verdict; and (3) the trial court prevented him from presenting a defense when it excluded expert testimony regarding his vulnerability to giving a false confession. We will consider each of these issues in turn.

**Analysis**

*Competency*

"The Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution prohibit the trial of a person who is mentally incompetent." State v. Blackstock, 19 S.W.3d 200, 205 (Tenn. 2000); see also Pate v. Robinson, 383 U.S. 375, 385 (1966). The United States Supreme Court, in Dusky v. United States, 362 U.S. 402, 402 (1960) (*per curium*), articulated the test for competency to stand trial: "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational and factual understanding of the proceedings against him." See also Blackstock, 19 S.W.3d at 205. If a defendant's competency is in question, "the trial court must conduct a hearing to determine whether the defendant has the capacity to understand the nature and purpose of the proceeding, to consult with counsel, and to otherwise assist in preparing his or her defense." State v. Harrison, 270

S.W.3d 21, 33 (Tenn. 2008). The burden of establishing incompetence to stand trial rests with the defendant, and the defendant must establish his incompetency by a preponderance of the evidence. State v. Reid, 164 S.W.3d 286, 307 (Tenn. 2005). "The trial court's findings 'are conclusive on appeal unless the evidence preponderates otherwise.'" Id. at 306 (quoting State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991)).

In the instant case, Dr. Hutson testified that, after performing two evaluations on the Defendant, he concluded that the Defendant had a "good understanding" of his attorney's role and was "competent to proceed as he understands the process, the charges, the potential consequences and has the ability to confer [with his attorney]." While Dr. Bishop initially testified that the Defendant was "not competent to assist his attorney properly" due to his mental retardation, when questioned by the trial court, she stated that the Defendant was "capable of consulting with his lawyer" and that he had a "rational and factual" understanding of the charges against him.

The trial court reasoned that Dr. Bishop testified to "nothing concrete" that would lead the court to believe that the Defendant did not meet the legal standard for competency to stand trial. According to the trial court, Dr. Bishop "did not tell the [trial court] that she did not believe he had the present ability to consult with his attorney"; however, "she did tell the [trial court] that he did have a rational and factual understanding of the proceedings against him, and she did tell the [trial court] that she believed that [the Defendant] was able to participate in his own defense." Furthermore, the trial court reasoned, Dr. Hutson stated "unequivocally" that the Defendant did have the necessary understanding of the proceedings and charges against him, as well as the capability to assist and consult with his attorney in his own defense. Based on this, the trial court concluded that the Defendant was competent to stand trial. The evidence does not preponderate against the trial court's findings. Accordingly, the Defendant is entitled to no relief on this basis.

*Sufficiency of the Evidence*

The Defendant also contends that the State's evidence was insufficient to support his conviction for first degree murder during the perpetration of aggravated child abuse. Our standard of review regarding sufficiency of the evidence is "whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not

weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The Defendant was convicted of the "killing of another committed in the perpetration of or attempt to perpetrate . . . aggravated child abuse." Tenn. Code Ann. § 39-13-202(a)(2) (2006). A person commits aggravated child abuse when he "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury" and "serious bodily injury to the child" results. Tenn. Code Ann. §§ 39-15-401, 402 (2006). The Defendant concedes in his brief that "the most damaging evidence against [the Defendant] in this case is his statement." However, he argues that "the evidence of a confession is not sufficient to sustain a conviction" because the Defendant's mental retardation, Dr. DeClue's testimony about false confessions, and the fact that "the process of obtaining [the Defendant's] confession [was] not preserved" rendered the danger of a false confession "too great" for the jury to rely upon the statement. We agree that the Defendant's confession is the most powerful evidence in the instant case. However, we disagree that the confession is insufficiently reliable to support the jury's verdict.[6]

We first note that Dr. DeClue's testimony was general. Dr. DeClue testified to the general characteristics, such as low intelligence, that might make one susceptible to giving false confessions, as well as the nature of certain interrogation techniques used in the instant case and their relative potential to engender a false confession. The Defendant specifically points to Dr. DeClue's testimony about the unreliability of transcribed, rather than recorded,

_____

[6] We note that "[i]t is a well-established principle of law in this state that a conviction cannot be founded solely upon a defendant's confession, and our cases have long required some corroborating evidence." State v. Smith, 24 S.W.3d 274, 281 (Tenn. 2000) (citing Ashby v. State, 124 Tenn. 684, 697-98 (1911). However, "Only slight evidence . . . is necessary to corroborate a confession and thus sustain a conviction." State v. Ervin, 731 S.W.2d 70, 72 (Tenn. Crim. App. 1986). In this case, substantial amounts of additional circumstantial evidence sufficiently corroborates the confession.

statements.[7]  However, the weight of that testimony, as it applies to the instant case, was ameliorated by Brown's testimony that the statement was transcribed "verbatim" and was a true and accurate reflection of the questions posed and answers given.

Furthermore, the Defendant's testimony about his interview with Sergeant Lundy was in direct contradiction with that of Sergeant Lundy himself.  The jury clearly chose to reconcile such conflicts in the testimony in favor of Sergeant Lundy.  Furthermore, the Defendant's credibility was brought into question when his own testimony about the events of that day were contradicted in several places by the testimony of Sharonda, ShaNika, and Sister.  The jury clearly chose to discredit the Defendant's testimony that he did not hurt the victim and that his confession was false.  We may not reassess the credibility of the Defendant's testimony or reweigh the impact of Dr. DeClue's testimony.  See Bland, 958 S.W.2d at 659; State v. McCloud, 310 S.W.3d 851, 867 (Tenn. Crim. App. 2009).  The reliability of the Defendant's statement and the credibility of the Defendant's testimony are questions of fact left to the jury.  Id.

The Defendant also asserts that, "absent [the Defendant's statement[,] there really isn't much evidence to determine what happened to cause the death of the victim."  We again disagree.  The Defendant's statement that he "punched [the victim] with [his] fist in the stomach 2 times" is consistent with Dr. Funte's conclusion that the victim died of internal injuries resulting from "non-accidental blunt force trauma" to the front of her abdomen. Furthermore, the Defendant's statement that, when he punched the victim, he was in the "back room" trying to get the victim to sleep because she "wouldn't stop crying" was consistent with the testimony of Sharonda and ShaNika who both testified that, at some point that day, the Defendant was alone with the victim in the back bedroom.  Sharonda testified that, at one point after the Defendant had gone into the back bedroom with the victim, she heard a "smack noise."  ShaNika testified that, when the Defendant was alone in the back bedroom with the victim, she heard the victim "moan twice" in a way that was concerning to her because it was "unusual" and "not like [the victim]."  When ShaNika went to check on the victim, she encountered the Defendant coming out of the room, and he stopped her from going in, telling her that the victim was asleep.

In addition, there was ample testimony as to the Defendant's strange behavior before the victim was discovered dead.  Lasandra testified that it was common knowledge in the house that the children were not allowed in the backyard, and Sharonda and Lasandra both testified that a small child could not have operated the gate leading to the backyard.  Yet, Sharonda testified that, at one point when the Defendant was outside with the victim and

---

[7] Our supreme court has held that "neither the state nor the federal constitution requires electronic recording of interrogations."  State v. Godsey, 60 S.W.3d 759, 772 (Tenn. 2001).

Sharonda was inside, she heard the victim "scream," and when she went outside, she encountered the Defendant "coming from the backyard with the victim" who was crying and covered in grass and dirt. Sister testified that, when she was playing outside with the victim, "some man came out and grabbed [the victim]" and brought her into the backyard, and she heard a strange noise while the two were in the backyard out of sight. Sharonda and ShaNika both testified that, although the Defendant never had been the victim's babysitter before and only had met her once before very briefly, the Defendant was unusually attentive to the victim when she was in the back bedroom. The Defendant rushed to respond to the victim, to the exclusion of Sharonda and ShaNika, the victim's usual caretakers. Furthermore, Sharonda testified that she was surprised when the Defendant called shortly after leaving the house to ask whether anybody had checked on the victim.

After viewing the evidence in the light most favorable to the State, see Jackson, 443 U.S. at 319, this evidence was clearly sufficient to lead a rational trier of fact to conclude, beyond a reasonable doubt, that the Defendant caused the death of the victim during the perpetration of aggravated child abuse. Accordingly, the Defendant is entitled to no relief on this basis.

*Limitation of Expert Testimony*

The Defendant argues that "the trial court clearly committed reversible constitutional error by depriving the Defendant of his due process right to present a defense in not allowing him to present proof of his mental condition to the jury for their consideration in determining the validity of his confession." That is, he argues that Dr. DeClue should have been allowed to testify about the results of various tests he performed on the Defendant and that testimony should have "been considered by the jury regarding whether the Defendant's confession was accurate."

When "scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue," a qualified expert witness may "testify in the form of opinion." Tenn. R. Evid. 702. Furthermore, an expert witness may base his opinion testimony on information received during or prior to trial, as long as that information is "of a type reasonably relied upon by experts in the particular field" in forming such opinions. Tenn. R. Evid. 703. "Questions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court." State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002) (citing McDaniel v. CSX Transportation, Inc., 955 S.W.2d 257, 264-65 (Tenn. 1997); State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993)).

A panel of this Court recently addressed a similar question regarding the exclusion of certain expert testimony pertaining to false confessions and articulated the standard for determining whether the decision to exclude ceratain evidence violated a defendant's constitutional right to present a defense:

> Although "[p]rinciples of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony" favorable to his cause, State v. Flood, 219 S.W.3d 307, 316 (Tenn. 2007) (citing Chambers v. Mississippi, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); State v. Brown, 29 S.W.3d 427, 431 (Tenn. 2000)), that right is not without limits, see id. (citing Chambers, 410 U.S. at 302, 93 S.Ct. 1038). Indeed, the Supreme Court has observed that "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence." Chambers, 410 U.S. at 302, 93 S.Ct. 1038. "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." Flood, 219 S.W.3d at 316 (citing United States v. Scheffer, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998); Holmes v. South Carolina, 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006); Chambers, 410 U.S. at 302, 93 S.Ct. 1038). To determine whether a particular evidentiary ruling has violated a defendant's constitutional right to present a defense, a reviewing court must consider:
>
> > (1) Whether the excluded evidence is critical to the defense;
> >
> > (2) Whether the evidence bears sufficient indicia of reliability; and
> >
> > (3) Whether the interest supporting exclusion of the evidence is substantially important.
>
> Flood, 219 S.W.3d at 316 (citing Brown, 29 S.W.3d at 434–35; State v. Rice, 184 S.W.3d 646, 673 (2006); State v. Rogers, 188 S.W.3d 593, 614 (Tenn. 2006)).

State v. Ackerman, 397 S.W.3d 617, 633 (Tenn. Crim. App. 2012).

In Ackerman, the defendant moved to introduce the testimony of Dr. Bruce Frumkin, who intended to "provide the jury with psychological information about the defendant that would explain why he was more likely to provide false or inaccurate information" during a police interrogation. Id. at 631. Specifically, Dr. Frumkin had performed an IQ test, "a

personality inventory test, a personality factor test, and 'the Gudjohnsson.'" Id. at 631. However, Dr. Frumkin "reiterated that he would not offer an opinion on whether the defendant's admissions were false," and he only would testify that "the defendant possessed psychological traits that made him more vulnerable to suggestion." Id. The trial court in Ackerman excluded this testimony, reasoning that the testimony "would not substantially assist the trier of fact" and that it would "lead to confusion and misunderstanding." Id. Ultimately, this Court affirmed the trial court's decision, holding that the testimony was "marginally relevant at best" and that "a real possibility existed that Doctor Frumkin's testimony would lead to a confusion of the issues." Concluding that the testimony had "little probative value and did little in the way of attacking the prosecution's case," the Court found that the exclusion of Dr. Frumkin's testimony did not deprive the Defendant of his constitutional right to present a defense.[8]

In the instant case, the Defendant's attack on the reliability of his confession was clearly critical to his defense. However, based on the record before us, we cannot say that testimony regarding Dr. DeClue's testing, specifically, was critical to that defense. Dr. DeClue testified that, according to his tests, the Defendant received a "perfect" score on the memory and malingering test and that the Defendant's IQ was in the "mentally retarded range" somewhere "in the 60s." However, there is nothing in the record as to how the Defendant scored on any of the other tests performed by Dr. DeClue, including the suggestibility and compliance tests. Furthermore, although Dr. DeClue testified that his testing would have provided "facts and opinions that would be relevant to the jury's decision about whether the [Defendant's] statement was true or false," he gave no testimony regarding how comparatively vulnerable he believed the Defendant was to giving a false confession, or the likelihood that the Defendant in fact gave a false confession, based on his results. Therefore, we cannot conclude that the results of the Defendant's testing with Dr. DeClue were critical to his false confession defense because the majority of those test results, as well as Dr. DeClue's ultimate conclusions based on those results, are not in the record before us.

---

[8] However, the Court acknowledged that "expert testimony about a defendant's susceptibility to suggestion could be admissible." Ackerman, 397 S.W.3d at 632; see also State v. Ted Ormand Pate, No. M2009-02321-CCA-R3-CD, 2011 WL 693529, at *12 (Tenn. Crim. App., Nov. 22, 2011). Indeed, in Pate, a panel of this Court adopted the standard used by the Supreme Court of Kansas that

> "a defendant may introduce expert psychological testimony 'bearing on his or her ability to respond reliably to interrogation' as long as the expert offered information outside the jurors' usual human experience and did not comment on 'the expert's judgment on the defendant's reliability in the specific instance of the confession submitted for the jury's consideration.'"

Id. (quoting State v. Oliver, 280 Kan. 681, 124 P.3d 493, 508 (Kan. 2005)).

We also hold that the interests supporting exclusion of the testimony were substantially important. Dr. DeClue initially testified on October 6, 2011, four days before the start of trial. At that time, Dr. DeClue could not testify as to the substance of the evidence that the trial court ultimately excluded, because that evidence did not yet exist. That is, the court could not make a ruling at that time as to the admissibility of the results of Dr. DeClue's evaluations of the Defendant because Dr. DeClue had not yet completed his evaluation. In fact, the record reveals that Dr. DeClue only began his evaluation of the Defendant on that same day, October 6, 2011. Indeed, it was not until October 14, 2011, in the midst of trial, after the State had rested its case in chief, that Dr. DeClue first testified as to the results of his evaluation of the Defendant. Based on that, the trial court concluded that to allow such testimony would "not be fair to the administration of justice," as it would "put the State of Tennessee in a position where they could not rebut that testimony."[9]

Finally, we note that the Defendant was not totally barred from adducing evidence supporting his false confession defense. Dr. DeClue was permitted to testify as to the prevalence of false confessions and to the factors that can make an individual more vulnerable to giving a false confession. Dr. DeClue also testified that the length and techniques used during the Defendant's interview, as well as the fact that it was not recorded, cast doubt on its reliability. The Defendant also testified that his confession was false and gave his version of what transpired during his interview.

"Although '[t]he right to present witnesses is of critical importance . . . it is not absolute. In appropriate cases, the right must yield to other legitimate interests in the criminal trial process.'" Brown, 29 S.W.3d at 432 (quoting Chambers, 410 U.S. at 295). The trial court excluded a portion of Dr. DeClue's proffered testimony based on evidentiary and procedural grounds. The trial court found that Dr. DeClue's testimony regarding his testing of the Defendant did not "make any issue that would be before the jury more or less

---

[9] The trial court reasoned that the only possible way to allow the State to rebut the evidence would have been to grant a continuance. We note that "[t]he granting of a continuance lies within the sound discretion of the trial court." State v. Schmeiderer, 319 S.W.3d 607, 617 (Tenn. 2010) (citing State v. Odom, 137 S.W.3d 572, 589 (Tenn. 2004)). The indictment in this case was returned on February 5, 2009, and the Defendant was arraigned and defense counsel was appointed on May 19, 2009. The trial court, noting that this case "has been in this court for two and a half years," that "this court ordered that all motions be filed on this case in June," and that the Defendant would not be prejudiced by the exclusion of such evidence, declined to order a continuance. Under Tennessee Rule of Criminal Procedure 12.2(b), "[a] defendant who intends to introduce expert testimony relating to a mental disease or defect or any other mental condition of the defendant bearing on the issue of his or her guilt" must notify the State in writing "within the time provided for the filing of pretrial motions" unless the trial court directs otherwise. Therefore, we hold that the trial court did not err in the exercise of its discretion when it declined to order a continuance and, in fact, would have been within its discretion to bar the entirety of Dr. DeClue's testimony.

probable," and, if presented, "the danger of unfair prejudice would substantially outweigh any probative value of what would be speculative testimony." The trial court also found that it would "not be fair to the administration of justice" to allow such tardy expert testimony because, absent a continuance, the State would be unable to rebut it with its own expert. We hold that the trial court did not apply the rules of procedure and evidence "arbitrarily or disproportionately" so as to "defeat the purposes they are designed to serve" when it excluded this portion of Dr. DeClue's testimony. Accordingly, the Defendant's right to present a defense was not violated, and he is entitled to no relief on this basis.

## CONCLUSION

For the reasons set forth above, we affirm the judgment of the trial court.


_____

JEFFREY S. BIVINS, JUDGE